Soeder v. The St. Louis, Iron Mountain & Southern Railway Company, *Appellant*.

1. **Railroad : NEGLIGENCE : DEATH OF BRAKEMAN.** In an action by a widow against a railroad company for the death of her husband, a brakeman, it was shown by the plaintiff that the deceased was engaged at night in switching cars on a track where there was a rail so worn for the space of from four to six feet as to make a depression for that distance of an inch and a quarter, so that a car passing over it would be jolted or jarred and that deceased fell from the car on which he was riding at his post of duty, striking the ground at a point consistent with the theory that he was thrown from the car by the jar in passing over the depression in the rail and that he was dragged some distance and was killed, though nobody saw the accident. *Held* that the evidence was sufficient to authorize the case to go to the jury.

2. ——— : ——— : **QUESTION FOR JURY.** Whether there was a substantial defect in the track caused by the defective rail and whether the deceased was familiar with the track in question were questions for the jury, as different conclusions might be drawn from the evidence thereon.

3. ——— : **EMPLOYE USING DEFECTIVE APPLIANCE.** The knowledge of the deceased of the unsafe condition of the track would not defeat a recovery, if it was not so dangerous as to threaten immediate injury, or if he might have reasonably supposed that he could safely work on it by the use of care and caution.

4. **Evidence**: WIDOW SUING FOR DEATH OF HUSBAND: INFANT CHILDREN. The widow suing for the death of her husband, an employe of the defendant railroad, and charged to have been killed by its negligence, can testify as to the number of her infant children.

5. ———: ———: ———: REVERSIBLE ERROR. Nor is it reversible error to have permitted the plaintiff to testify that she had an infant child by a former marriage where the verdict was for thirty-five hundred dollars, as such evidence does not appear to have influenced the amount of damages.

*Appeal from St. Louis City Circuit Court.*—HON. SHEPARD BARCLAY, Judge.

AFFIRMED.

*B. Pike* for appellant.

(1) Plaintiff's testimony did not make a *prima facie* case, and the demurrer to the evidence should have been sustained. *Moore v. Railroad*, 28 Mo. App. 622; *Schutle v. Railroad*, 97 Pa. St. 455. (2) The court committed error in the admission of the testimony offered by plaintiff against the objection of defendant. *Stephens v. Railroad*, 96 Mo. 207; *Railroad v. Gower*, 31 Am. & Eng. R. R. Cases, p. 168; *Penn. Co. v. Roy*, 102 U. S. 459. (3) The court committed error in refusing to give the instructions asked by defendant. *Malone v. Howley*,. 46 Cal. 409; *Baxter v. Roberts*, 46 Cal. 187; *Sizer v. Railroad*, 7 Lansing [N. Y.] 67; *Strohlendorf v. Rosenthal*, 30 Miss. 674; *Haskin v. Railroad*, 65 Barb. 151; 31 Am. & Eng. R. R. Cases, 162; *Darracutts v. Railroad*, 31 Eng. & Am. R. R. Cases, 162; *Spelman v. Iron Co.*, 56 Barb. [N. Y.] 131; Wood on Master & Servant, sec. 414, p. 791. (4) The court erred in giving on its own motion the instructions numbered 1 to 9 to the jury. Wood on Master & Servant, sec. 368, p. 744; *Duffey v. Upton*, 113 Mass. 544; *LeBarron v.*

*Ferry Co.*, 11 Allen [Mass.] 312; Wood on Master & Servant, sec. 382, p. 754.

*A. R. Taylor* for respondent.

(1) The evidence was amply sufficient to take the case to the jury upon the question as to the cause of the death being the defective rail. *Kelly v. Railroad*, 70 Mo. 607; *Buesching v. Gas Co.*, 73 Mo. 230; *Schlereth v. Railroad*, 96 Mo. 514; *Schultz v. Moon*, 33 Mo. App. 340, 341. (2) The cases of *Moore v. Railroad*, 28 Mo. App. 622, and *Schutle v. Railroad*, 97 Pa. St. 455, if holding as contended by appellant, are in flat conflict with the Missouri cases cited above. But the case of *Moore v. Railroad* rested for authority solely upon *Schutle v. Railroad*, *supra*, and the latter case distinctly holds that there was no evidence of a negligent act by the defendant. In this case, the evidence of a very defective rail is conclusively shown, and the connection between the defective rail and the injury is as direct as circumstances may show. (3) There is a legal presumption that deceased was in the exercise of due care at the time of his death. "The law, out of regard to the instinct of self-preservation, presumes that deceased was in the exercise of due care." *Flynn v. Railroad*, 78 Mo. 212; *Buesching v. Gas Co.*, 73 Mo. 230.

BRACE, J.—This is an action by the widow of William Soeder for damages for the death of her husband, alleged to have been caused by the negligence of the defendant, in whose employ the said Soeder was, at the time of his death, engaged in the discharge of his duties as a brakeman.

Three grounds of recovery are stated in the petition : *First.* That the accident was caused by the failure of defendant to have a sufficient number of men to manage and control the train; *second*, by reason of a defective

brake upon the cars of said train, and, *third*, by the negligence of defendant in permitting its track to be, and remain, in a defective condition at the point where plaintiff's husband was run over and killed.

The first ground was practically abandoned on the trial; upon the second no evidence was introduced, and the case was tried, submitted and turned upon the third alleged ground of negligence. The plaintiff recovered judgment for thirty-five hundred dollars. On the trial, the defendant demurred to plaintiff's evidence. The material evidence for the plaintiff bearing upon the issue submitted was, in substance, as follows: Mrs. Soeder, the plaintiff, testified: That she is the widow of William Soeder; that, at the time of his death, on the twenty-seventh of August, 1886, he was twenty-nine years and six months old; that he was a brakeman in the employ of defendant, for whom he had been working in the yard since the fourth of July preceding his death; that he was a sober and industrious man, receiving as wages about seventy dollars per month; and, in answer to the question how many children she had, said: "I have one by him; I have two little ones. I have been twice married." She further testified that her husband had worked about three years as fireman and brakeman for the Missouri Pacific Railway Company before he worked for the defendant.

C. W. Sergeant testified: That the track upon which the accident happened was an Iron Mountain track; that from Stein street as one goes down towards the river the grade is very steep; that they were "hauling" Vandalia, Ohio & Mississippi and Chicago & Alton cars that night, all of which were heavily loaded; they were transfer cars that had been taken out of the yard loaded with ore; that they only took half the cars at a time; shoved them on the switch track and left them northeast of the Stein street crossing, and went back to get the other half; that witness stood at the crossing

to make the coupling; that they, he and Soeder, were shoving the cars in there around a sharp curve, and Soeder had to stand on the main track to pass signals from the engineer to witness. The examination then proceeded thus:

*Q.* "Who had to do that?" *A.* "Soeder."

*Q.* "After he signalled and the car moved, what did he do?" *A.* "He signalled back until I went in and made the coupling; after I made the coupling I gave the signal, all right, back up; I answered the signal to get on top."

*Q.* "Is that a brakeman's place?" *A.* "Yes, sir, especially shoving in on a track like that."

*Q.* "Where did you get up?" *A.* "Right at the Stein street crossing."

*Q.* "How was the train moving?" *A.* "Well, you can't judge; it is down grade in there. We just made the coupling, and after I got up on top, of course, they were not moving more than three or four miles per hour."

After several questions were asked and answered as to the number of brakemen on the train, and the number that such a train ought to have, the examination on the main question was resumed, thus:

*Q.* "When did you next see the deceased, William Soeder, after you saw him get up on top of the car?" *A.* "Not until the engine had come around the curve. The fireman came on the gangway and said: 'I think your partner has fallen off and got hurt.'"

He then says, in substance, that he went down on the side of the train opposite to that on which Soeder was lying and called him by name, got no answer, and went around on the other side of the train and found Soeder lying there, about forty-five, fifty or fifty-five feet northeast of Stein street; that, from the appearances, Soeder must have been dragged from twenty to twenty-five feet; that the wheels passed over him above the hips;

his body was lying outside the rail, and his limbs were lying inside, under the cars; he was dead; that he examined the track there that night when he went to work the second time; that Davis, the night yardmaster, was with him; that there was a defective rail there, a short rail, not more than from fifteen to eighteen feet long; that what is called the "ball" on the short rail was completely worn off, which made a kind of "offset" of an inch and a quarter, which would cause a car passing over it "to bound and jump;" that there must have been from four to six feet of this rail in that condition; that the top of the rail was splintered off, and the body of the rail lay on the ties; that the condition of the rail would cause cars going over it to jump; that this defective portion of the rail commenced about three or four feet from where Soeder fell; you could see how far he was dragged by the cinders being dragged along with him, as though the place had been swept by a broom; this sweeping commenced three or four feet northeast of the defective rail; the train was going in a northeast direction; that he has examined the condition of this rail since the accident, and it is in about the same condition as it was then; that the rail connected with this rail was in a good condition; that the outside rail was higher than this short rail; that the joint connecting this short rail with the next rail was a bad one; that there was a "lip" on the rail there, which was a half an inch or three-quarters of an inch; that he did not notice any other rail near there; that Soeder got off on the south side of the crossing, on the south side of Stein street; that he thinks Stein street is probably about twenty-five or thirty feet wide. If thirty feet wide, it was about fifty-five feet from where Soeder got on top of the car to the point where this defect in the track was; that he didn't see him fall, and didn't see him when he fell.

On cross-examination this witness testified: "That Soeder's body was found from forty to sixty feet from

Stein street; that if Soeder fell off from the car at the point where the appearance of dragging was, it must have been twenty-five or thirty feet from Stein street; that the switch which witness opened is a little south of Stein street, fifteen or twenty feet; that Davis, the foreman of the crew, was not there at the time of the accident; that the last time witness saw Soeder, he, Soeder, got onto the cars at Stein street. That he didn't know where Soeder was when he was killed, or whether he was standing up or sitting down; that he didn't see Soeder after he got on the train, and that not seeing him when he fell witness does not know how Soeder fell or how he was killed. That when Soeder fell off the cars, if he did fall, he was about forty or forty-five feet from Stein street; that the switch he spoke of is south of Stein street and that the defective rail was thirty-five or forty feet from Stein street."

The following question was asked witness in relation to the short rail:

Q. "Isn't that a very common thing in a track, sidetrack in a yard, that kind of a rail; don't you find that sort of a rail very frequently on a sidetrack in a yard?" A. "Not a rail battered down the way that was; I have seen rails battered down. Yes, sir."

S. K. Harding testified in substance as follows: That he is a railroad man, having been engaged as switchman and brakeman for about sixteen years; that he knows the Iron Mountain "ear" track at Stein street; that he saw the rail of that track about thirty or forty feet north of Stein day before yesterday; that he went to look at it in company with Mr. Sergeant (the preceding witness) and a Mr. Donahue; that he saw the rail spoken of; it was a rail about fifteen or sixteen feet long; that the ball of the rail was worn off badly for about a distance of five or six feet from the joint, so as to give a fall of an inch or an inch and a half; that the west rail was a good rail and was not worn off any; that the point where this rail was worn off is an inch or an

inch and a half lower than the other part of the rail; that the effect of this low joint is like riding in a wagon on a country road and the forward wheel strikes a rut like, if you have ridden in a wagon. Sitting on a car or standing on it, the sudden jar is liable to throw you off.

And on cross-examination he testified: That he saw this rail a day or so ago and had seen it last winter when he worked there; that a car going over said rail would make a jolt of an inch or an inch and a half; that a car going over such a rail at three or four miles an hour would give a jar; that witness, as a railroad man, had had many jars; that he does not know anything about the kind of cars that ran over the switch track the night of the accident; that he had never seen the track there before the accident, and doesn't know anything about the condition of said track at the time of the accident.

This was all the evidence upon which plaintiff relied for a recovery. The defendant did not stand on its demurrer to the evidence, but introduced evidence to sustain the issues upon its part. This evidence, however, did not tend to strengthen the plaintiff's case but was confined to showing that the defective rail complained of had been there for an indefinite period of time before the accident, had been in continual use since, and was then in use on the day of the trial, was not in the condition testified to by plaintiff's witnesses, and was in a reasonably safe condition, at the time of the accident. And the question remained for the court to determine after all the evidence was in: Is there any evidence tending to show that the defective rail was the cause of Soeder's death?

I. It satisfactorily appeared from the evidence that his death was the result of defendant's train passing over his body; that by some means his body got beneath the wheels of the train at a point on the track,

distant from the defective rail in the direction in which the train was traveling, about four or five feet. The evidence would warrant the inference that just before the train entered upon this defective rail, the deceased was at his post, sober, in good health, on the top of one of the cars in the train, in the discharge of his duties as brakeman, and that he was exercising due care; that the car on which he was "jolted or jumped" on entering upon this defective rail. The distance from the place where the could have inferred this jolting took place, to the place where it was found from the marks on the track that the body had fallen, considering the direction in which and the rate at which the cars were moving, was consistent with the theory, that the fall was caused by the jolting of the car in its passage onto or over the defective rail; there is nothing in the facts tending to sustain any other theory, and under the authority of the rule laid down in the following cases, which has been reiterated in many others the court could not have sustained the demurrer on the ground that there was *no evidence* tending to show that the death was caused by the defective rail. *Meyer v. Railroad,* 40 Mo. 151; *Kelly v. Railroad,* 70 Mo. 604; *Buesching v. Gaslight Co.,* 73 Mo. 221; *Scovell v. Glasner,* 79 Mo. 449; *Turner v. Langdon,* 85 Mo. 438; *Cook v. Railroad,* 63 Mo. 397.

II. As to whether there was a substantial defect in the track occasioned by the defective rail or whether the deceased was familiar with this particular track were questions also for the jury, as different conclusions might be drawn from the evidence on these subjects. Conceding, however, that the deceased was perfectly familiar with this track and remained in defendant's employment, this of itself would not have been sufficient to defeat a recovery. The deceased's knowledge of the unsafe condition of the track, if it was unsafe, would not defeat a recovery, if "it was not so dangerous as to

threaten immediate injury or if he might have reasonably supposed that he could safely work about it by the use of care and caution." *Huhn v. Railroad*, 92 Mo. 440, and cases cited. The court committed no error in refusing to take the case from the jury.

III. The judgment should not be reversed because the plaintiff was permitted to testify as to the number of her infant children; the husband was bound for the support of his own child, and his death cast this burden upon her (*Tetherow v. Railroad*, 98 Mo. 74), and there is nothing in the amount of the damages assessed, to suggest the idea that it may have been affected by the fact that she had another child by a former husband.

IV. Conceding that the evidence was sufficient to take the case to the jury, as we have found that it was, the issues were presented by an admirable series of instructions, covering the whole law of the case, and including every proposition contained in the defendant's refused instruction, that could properly have been given Finding no reversible error in the record the judgment is affirmed. All concur, except BARCLAY, J., not sitting.