## CONNOLLY v. ST. JOSEPH PRESS PRINTING COMPANY, Appellant.

### Division One, January 13, 1902.

1. **Negligence**: INSTRUCTIONS: REFUSAL GENERALLY. Where the instructions given favorably presented defendant's theory of the case, it was not error to refuse others which contained nothing to which defendant was entitled that was not contained in the instructions given.

2. ———: KNOWLEDGE OF DEFECTS IN MACHINERY: ASSUMPTION OF RISK: CONTRIBUTORY NEGLIGENCE. The plaintiff was not a machinist and the defects in the complicated machine were not necessarily obvious to him in the discharge of his duties, nor was it his duty to search for them, nor was the danger from these defects manifest to him in the ordinary discharge of his labor. About a week before the accident, he observed for the first time that the machine knife revolved, although locked by a shifting bar so as not to move, and this fact he immediately reported to the foreman, who called in the machinist of the concern, repairs were made, and plaintiff was assured by the foreman that the machine was all right. A week later, while he was carefully attendant upon his duties, the knife again revolved, although locked as before, and cut off his hand. The evidence tended to show that the unexpected movement was due to defects in the machine. *Held*, that plaintiff neither assumed the risk of such injury, nor was guilty of negligence contributory thereto.

Appeal from Buchanan Circuit Court.—*Hon. A. M. Woodson, Judge.*

AFFIRMED.

*Brown & Dolman* for appellant.

(1) While the rule is that it is the duty of the master to use ordinary care to furnish a reasonably safe place to work, and reasonably safe appliances with which to work, and that the servant may assume that this duty on the part of the master

has been performed, it is qualified by the equally well-settled rule that the servant may not, as against his master, assume as true what he knows to be untrue, or what the ordinary care which he has contracted to exercise would demonstrate to be untrue. Bailey's Master's Liability, pp. 180, 181; Epperson v. Postal Tel. Cable Co., 155 Mo. 375. This latter rule necessarily results from the self-evident proposition that it is as much the duty of the servant to take care of himself as of the master to take care of him. Warmell v. Railroad, 79 Me. 405; Foley v. Light Company (N. J.), 24 Atl. Rep. 487; Epperson v. Postal Tel. Cable Co., supra; Rush, Adm'x, v. Railroad, 36 Kan. 129; Darracatt v. Railroad, 31 Am. and Eng. Railroad cases, 157. The servant and master having equal opportunity to ascertain and judge, if the failure of the master to ascertain a defect which makes an appliance dangerous constitutes negligence on his part, as does the same failure on the part of the servant constitute negligence in him; and if, having discovered it, it be negligence on the part of the master to permit the servant to use it, it would be negligence on the part of the servant having discovered the defect, to use it himself. This is only applying the rule of equal justice. Rush, Adm'x, v. Railroad, supra; Brown v. Railroad, 59 Kan. 70. Out of these simple principles has grown the rule already referred to, that when a person enters into a dangerous employment, he not only assumes the risks ordinarily incident thereto, but also the risk he may incur from manifest perils. 1 Bailey's Pers. Inj. Relating to Master and Servant, sec. 507. And no court has had more frequent occasion to state this rule than the Supreme Court of Missouri. Lucey v. Oil Co., 129 Mo. 40; Burnes v. Railroad, 129 Mo. 51; Fugler v. Bothe, 117 Mo. 475; Aldridge v. Furnace Co., 78 Mo. 559; Dewitt v. Railroad, 50 Mo. 302; Spira v. Coal & Mining Co., 68 Mo. 68; Bohn v. Railroad, 106 Mo. 429; Epperson v. Postal Tel. Cable Co., supra; Steinhauser v. Spraul, 127 Mo. 541; Price v. Railroad, 77 Mo. 508; Thomas v. Railroad, 109 Mo. 199;

Porter v. Railroad, 71 Mo. 77.    The same rule seems to have been universally applied by the courts of other States.    Knisley v. Pratt, 148 N. Y. 372; Williams v. Railroad, 116 N. Y. 628; Shaw, Adm'x, v. Sheldon, 103 N. Y. 669; Powers v. Railroad, 98 N. Y. 274; O'Maley v. Gas Light Co., 158 Mass. 135; Goodridge v. Washington Mills Co., 160 Mass. 289; Cunningham v. Paper Co., 163 Mass. 89; Smith v. Beaudray, 175 Mass. 289; Umback v. Railroad, 83 Ind. 194; Railroad v. Henderson, 142 Ind. 596; Gaffney v. Inman Mfg. Co., 18 R. I. 781; Gaffney v. Railroad, 15 R. I. 456; Buzzell v. Laconia Mfg. Co., 48 Me. 113; Wormall v. Railroad, 79 Me. 397; Albrecht v. Railroad, 108 Wis. 530; Howe v. Medaris, 183 Ill. 288; Railroad v. Wilson, 189 Ill. 89; Railroad v. Jackson, 85 Va. 489; Secard v. Railroad (Mich.), 65 N. W. 550; Johnson v. Railroad, 51 Ga. 133; Railroad v. Bishop, 50 Ga. 465; Railroad v. Mara (Ark.), 16 S. W. 196; Norton v. Railroad (Ky.), 30 S. W. 599; Jackson v. Railroad, 31 Kan. 761; Patnodi v. Harter, 20 Nev. 303; Rogers v. Railroad, 76 Tex. 502; Brassman v. Railroad, 113 Pa. St. 490; Wells v. Railroad, 56 Iowa 560; Heath v. Whitebreast, C. & M. Co., 68 Iowa 737; Weeks v. Fremont Mill Co., 3 Wash. 629.    (2) Were there no such rule as that relating to the assumption of obvious risks, the negligence of the plaintiff contributing to his injury would, as a matter of law, preclude a recovery.

*Thos. F. Ryan* and *J. W. Boyd* for respondent.

(1) Appellant concedes that the machine on which plaintiff was injured, was defective and dangerous, and that it had knowledge thereof, and that plaintiff was injured by reason of its defective condition, but appellant now attempts to avoid its liability for injuring plaintiff on the ground that the defect in the machine was so apparent and obvious that plaintiff assumed the risk, and, therefore, ought not to recover for the injury he

Vol 166 mo—29

received. The determination of this question resolves itself into the inquiry as to what knowledge plaintiff had as to the defective condition of the machine after he called the foreman's attention to its defect and was assured that the same was repaired and was safe. Any prior knowledge plaintiff may have had as to the condition of the machine is only material so far as the jury considered it in determining the question as to what knowledge he had at the time he was injured. Plaintiff had the right to rely on the assurance of the foreman that it was repaired and was safe. Bailey on Personal Injuries Relating to Master and Servant, sec. 898, p. 307; Sullivan v. Railroad, 107 Mo. 78; Herdler v. Stove Co., 136 Mo. 17; Conroy v. Iron Co., 62 Mo. 39; Duerst v. St. Louis Stamp. Co., 63 S. W. 830; Shortel v. St. Joseph, 104 Mo. 114; Bell & Coggeshall v. Applegate, 62 S. W. 1124; McGown v. Railroad, 61 Mo. 532. (2) Whether the plaintiff had assumed the risk or was guilty of contributory negligence, was a matter of affirmative defense, and it was necessary for the defendant to plead and prove the same. 5 Ency. of Pleading and Prac., p. 1; Fisher v. Central Lead Co., 156 Mo. 485; Doyle v. Trust Co., 140 Mo. 19; Settle v. Railroad, 127 Mo. 344; Williams v. Railroad, 109 Mo. 486; Young v. Iron Co., 103 Mo. 324; Thorpe v. Railroad, 89 Mo. 664; Scott v. Springfield, 81 Mo. App. 312; Thompson v. Railroad, 86 Mo. App. 141. (3) The question whether the plaintiff assumed the risk or was guilty of contributory negligence under the facts in this case was clearly a question for the jury. For the rule in this State is that it is only where danger from the defect is so glaring that it is apparent that with the utmost skill the danger is still *imminent,* and that it is so dangerous that none but a reckless man would incur it, that the court can declare as a matter of law that plaintiff has assumed the risk and can not recover. If, upon all the evidence, there is substantial doubt, the question is one of fact for the jury, and a forced nonsuit or demurrer to the evidence is not permissible. Paulk v. Provision Co., 159

Mo. 475; Stulzor v. Packing Co., 84 Mo. 565; Harriman v. Star Co., 81 Mo. App. 129; Conroy v. Iron Co., 62 Mo. 39; Thompson v. Railroad, 86 Mo. App. 149; Wharton on Neg., sec. 425; Huth v. Doble, 76 Mo. App. 675; Woods' Railroad Law, p. 14-160; Woods' Master and Servant, 761; Snow v. Railroad, 8 Allen 450; Thorpe v. Railroad, 89 Mo. 663; Eckhorn v. Railroad, 130 Mo. 575; Dowell v. Railroad, 115 Mo. 205; Gratiot v. Railroad, 116 Mo. 466; Huhn v. Railroad, 92 Mo. 447; Lynch v. Railroad, 112 Mo. 440; Stube v. Iron Co., 85 Mo. App. 650; Scott v. Springfield, 81 Mo. App. 312; Bradley v. Railroad, 138 Mo. 306. (4) And the question in this case is not, did the defendant know of the defect in the machine, but did he also know and appreciate the danger in using the machine, for though the plaintiff may have known of the defective condition of the machine, yet unless the defect was so glaring that a reasonable and prudent person would believe that the same could not be used with the utmost care and skill without injury, then the mere knowledge of the defect would not defeat plaintiff's right of recovery. And this has been the rule of law in this class of cases as announced by this court, and the Court of Appeals ever since, as shown by numerous cases—a few of which we cite: Huhan v. Railroad, 92 Mo. 440; Doyle v. Trust Co., 140 Mo. 1; Bradley v. Railroad, 138 Mo. 293; Scott v. Springfield, 81 Mo. App. 312; Duerst v. St. Louis Stamp. Co., supra; Francis v. Railroad, 127 Mo. 658; Thompson v. Railroad, 86 Mo. App. 141. (5) Before a verdict can be set aside by the appellate court, it should appear that there is no evidence to support it, that it is the result of passion, prejudice or misconduct of the jury. Mere insufficiency of the evidence in the opinion of the appellate court, is not sufficient. James v. Mutual Life Assn, 148 Mo. 16; Huth v. Doble, 76 Mo. App. 671; Lower v. Pauley, 76 Mo. App. 287.

BRACE, P. J.—This is an appeal by the defendant from a judgment of the Buchanan Circuit Court in favor of the plaintiff for the sum of $5,000, in an action for personal injuries.

The only errors assigned for reversal are the refusal of the court to sustain a demurrer to the evidence, and to give two instructions asked for by the defendant. The court gave seven instructions for the defendant, presenting its side of the case very favorably, and it is only necessary to say in regard to these refused instructions that they contained nothing to which the defendant was entitled that was not included in the instructions given. The only real question in the case is whether the court erred in submitting the case to the jury.

The cause of action stated in the petition is, in substance: That the defendant owned and operated a printing plant, in which the plaintiff was one of its employees. That among other instruments and machinery used and operated in its business was a machine known as a "shaver" with a knife attached to a spindle for trimming and shaving stereotype plates, which had a certain lever and spring, and brake or shoe and grooves and fasteners or clutches that acted upon a belt and pulley and other appliances of said machine which, when in proper repair and condition, would stop and hold said spindle to which said knife was attached, so that the stereotype plates could be safely removed by the employee in charge. That on and for a long time prior to October 29, 1898, the defendant had negligently permitted this lever spring, and brake or shoe and the grooves, fasteners and other appliances to become and remain worn and defective so that they would not hold the spindle, which would revolve when it ought to remain stationary, which condition had been known to the defendant for months, and was not known to plaintiff. That at said date and while said machine was in this condition, the plaintiff in the discharge of his duty as such employee attempted to take out a plate, which had been shaved, when the knife suddenly re-

(PLATE 1.)

(PLATE 2.)

volved, on account of said defects, cutting off his right hand and two fingers of his left hand.

The answer was a general denial; a plea of contributory negligence; and risk assumed.

The foregoing picture (plate 1) shows the machine upon which the injury occurred:

"The bed consists of a sector of something less than half a hollow cylinder about two feet long and one foot internal diameter, lying horizontally on its foundation with the concave surface up. Along the center of the circle of which this concave surface forms a part, and extending the length of the bed, extends a spindle of great diameter hung in solid bearings at each end, carrying a knife its entire length and extending out so far from the spindle or shaft that when it revolves the edge of the knife describes a circle about half an inch inside the concave surface of the bed.

"The stereotype plate is cast about seventeen inches wide and twenty inches long and is curved to nearly a half circle so that it exactly fits the concave surface of the bed. The operator stands on the side of the machine at the right of the picture and facing it. He puts the curved plate in the bed of the machine, takes hold of the ring-shaped handle at the end of a long steel bar at his right and pulls it. Two pins are seen on the other end of the bar—one on each side of the belt which comes down from a shaft above. As he pulls out the bar the farther pin pulls the belt from a loose pulley, on which it seems to be running in the picture, to the tight pulley, which appears naked in the picture. The knife slowly revolves toward him, at a speed of about eight revolutions per minute. The edge enters the bed on the side toward him, and passes out on the outer side, shaving the plate as it goes. The instant it leaves the plate on the back side he shoves in the bar, the handle of which he has been holding, the pin nearest him forces the belt to the loose pulley, the knife stops and he takes the finished plate and removes it from the machine.

"The parts of the machine which produce these movements are shown by the foregoing picture (plate 2):

"They consist of a belt coming down from its line shaft above so as to pass over two pulleys, a tight and a loose one situated side by side on a screw shaft, the screw of which engages the teeth of a large gear wheel keyed to the end of the knife shaft, which is out of sight beyond the wheel, and the long horizontal shifting bar which pushes the belt to the loose pulley to stop the machine, in which position it appears in the picture, and pulls it to the pulley which is keyed tight to the screw shaft to start it. The riveted end of the pin that pushes the belt to the loose pulley can be plainly seen when it passes through the bar at the edge of the belt. The pin which pulls the belt to the tight pulley is hidden by the shadow of the ascending portion of the belt.

"At the outer end of this lever is shown a horizontal slat passing through it. At the end of this slat nearest the operator appears a vertical lever, near the upper end of which a bolt is fixed which passes loosely through this slat. Following this lever downward in the picture we come to its fulcrum, which appears as the riveted head of a pin or bolt, and farther down is the brake shoe which appears as it presses on the top of the tight pulley. This is for the purpose of stopping the revolution of the screw suddenly with the same movement which shifts the belt from the tight to the loose pulley. Next to the teeth of the wheel on each side may be seen a small standard with a slot through which the shifting bar passes, and by which it is held steadily in its place. At the bottom of the slot next to the operator is a spring which continually presses the bar upward against the top of the slot, and on the top of the bar are two notches into which the material at the top of the slot is pressed when the bar reaches the right place in starting and stopping, and which are intended to hold it so that the belt will not shift with its own movement.

"In starting the machine the operator takes hold of the

ringlike handle, presses downward so as to disengage the notch in the top of the bar, and pulls it toward him, pulling the belt to the tight pulley. When the outer end of the horizontal slot in the bar strikes the bolt in the top of the brake lever, it raises the brake from the pulley and the screw revolves. The other notch in the top of the bar engages itself, and holds it in position when the operator releases it. To stop the machine this operation is reversed."

Zumwalt, Snowden and Shoemaker, stereotypers, who had worked in the defendant's plant and had served this machine in the same line of duty as did the plaintiff, and who were introduced as witnesses in his behalf, testified that for several years prior to the accident the spindle or shaft carrying the knife would at times revolve when the bar of the shifter was shoved back or in, and the spindle should have been stationary, but they seem to have had very vague ideas, if any, of the cause of this occasional eccentric movement. The following extracts from the testimony of the plaintiff show his version of the accident:

"Q. Did you ever work at that machine? A. Yes, sir.

"Q. Under whose direction? A. Under Mr. Louis Connolly's.

"Q. About how long did you work at that machine before you were injured? How many years? A. A little over three years.

"Q. Who else used that machine? A. Why, Mr. Louis Connolly himself, and other men that worked there with us.

"Q. Tell the jury whether in putting in and taking a plate out of that machine it is necessary to stop the spindle to which the knife is attached? A. Yes, sir; it is necessary to stop it.

"Q. How do you do that? A. By working the belt shifter, reversing the belt from the tight pulley to the loose one.

"Q. During the time you were working the machine, did the shifter work the belt and stop the spindle while you operated it? A. Yes, sir.

"Q. Now, what night or morning was it that you were injured? A. Saturday morning, the twenty-ninth day of October.

"Q. About what time in the morning? A. Between fifteen minutes and ten minutes of three if my knowledge serves me right.

"Q. How many plates had been shaved on that machine up to that time,. that night? About how many? A. Well, there may have been about—I think that was the eleventh plate; about ten plates before that.

"Q. Who used the machine to shave the plates that night before you were hurt? A. I did and Mr. Connolly, the foreman.

"Q. About how many plates did you shave that night? A. Possibly six or eight.

"Q. Now during that night up to the time that you were injured, in operating that machine, did you notice any defect in it? A. No, sir.

"Q. Connected with that machine? A. No, sir.

"Q. Did you operate the machine the night before? A. Yes, sir.

"Q. Did you notice any defect in the machine the night before? A. No, sir.

"Q. Did you know of any defect in that machine at the time you were injured, that would make it dangerous for you to attempt to put a plate in or take it out, as you were attempting to do? A. No, sir.

"Q. What do you know, if anything, about any repairs being made on that machine a short time prior to your being hurt? A. I know of some repairs being made on it, but as to what the repairs were, I don't know.

"Q.   Who was it that repaired it?   A.   Mr. White, the machinist.

"Q.   How many days before you were hurt?   A.   A week or ten days previous to my injuries.

"Q.   What did Mr. Connolly say to you and the other helpers, about the machine being safe after the machine was repaired?   A.   He had told me the machine was repaired.

"Q.   What did he say to you about the machine. being safe to use after it was repaired?   A.   He said the machine was fixed and was all right.

"Q.   Did you then, in using that machine after—tell the jury whether you relied on his statement as to the condition of that machine?   A.   Yes, sir; he being the foreman—

"Q.   Did you notice or have any knowledge of any defect in that machine the night you were operating it?   A.   No, sir.

"Q.   Now, at the time you were injured, you say that it was about three o'clock in the morning?   A.   Somewheres between fifteen minutes to three and three o'clock.

"Q.   Who put the plate in that you were attempting to take out?   A.   Mr. Louis Connolly, the foreman.

"Q.   At that time of night tell the jury whether you were required to work rapidly or not?   A.   Yes, sir.

"Q.   Are you a machinist or have you any knowledge of machinery?   A.   Not any at all; no, sir.

"Q.   What if anything have you had to do with the adjusting of the belt of that machine?   A.   Never had anything to do with it.

"Q.   Did you make any repairs on that machine at any time, to your knowledge?   A.   No, sir; not to my knowledge.

"Q.   Who did the oiling of that machine?   A.   I did a great deal of the time.

"Q.   Did you oil that machine the night you were hurt?   A.   Yes, sir.

"Q.   Now you say that Mr. Louis Connolly put the plate in?   A.   Yes, sir.

"Q. What were you doing at the time? A. I was just after taking a plate from the machine and setting it on the floor.

"Q. Why didn't Mr. Connolly take the plate out? A. He put the plate in and shaved it and was called away by Mr. Castles for some other work, and I attempted to take the plate out when I was caught.

"Q. How long had the machine been stopped after Mr. Connolly put the plate in before you attempted to take it out? A. Oh, two or three minutes.

"Q. Now tell the jury just how you went to take that plate out and how you were injured? A. Well, I set a plate on the floor and went back to the shaving machine to remove the plate that Mr. Connolly, the foreman, had placed in there, and I had my hand hold on it—and I had my hand hold, and I put my right hand over the edge of the box in this manner (indicating). You have to take the plates with the ends of your fingers this way (indicating) and work the plate down about two inches about, or two and one-half inches from the end of the box towards the left hand, and then you get hold with the left hand in this manner (indicating) when the blade comes around on my right hand and cuts it off and I attempted to save my arm and I lost two fingers of the left hand too.

"Q. What was the position of the knife or the lever and shifter and belting, so far as you can tell at the time you went to take the plate out? A. The lever was shoved back and the knife stopped; probably—oh, about ten or twelve inches from the edge of the box.

"Q. How long would it take the knife to go the distance from where it was stopped, to where it would reach your hand at the point where you caught the plate? A. About two seconds.

"Q. Where did it strike your arm? A. About above the wrist."

And on cross-examination he further testified:

"Q.   And you never knew that the knife was moving until it caught your hand?   A.   No, sir; I was paying attention and taking my plate out when she come around and caught me.

"Q.   So that you say you never heard anything about the machinery having been out of order this time you saw it revolving, there was nobody spoke about its being out of order at all?   A.   Before that?

"Q.   No, at that time?   A.   Not to my knowledge, only when it was repaired.

"Q.   Only when it was repaired?   A.   Yes, sir.

"Q.   Never heard of it at all?   A.   Not of the machine starting away until I saw it myself.

"Q.   Now when was it you saw it yourself?   A.   About a week or ten days before I was hurt as I said before.

"Q.   About a week or ten days before you were hurt?   A.   Yes, sir.

"Q.   What were the circumstances?   Just tell the jury how that happened at that time?   A.   Well, I don't know exactly what night in the week it was; when I come in I oiled the machine and after oiling the machine it is always necessary to start up, after we oiled the machinery, and I oiled the machine and went and started the motor, ours was electric power there, and as I come out and passed by the machine I saw the knife revolve and I called Mr. Connolly's attention to it, and he called Mr. White's attention to it, the machinist, and he come down and repaired the machine; what he repaired I don't know, I was busy doing some job work; that he shut off the power I know."

The actual defects in the machine are disclosed by the following extracts from the testimony of Mr. Motter, an expert machinist, who observed the machine before, and examined it after, the accident:

"Q.   Can you describe that machine?   A.   Yes.

"Q. You are familiar with it and know it? A. Yes, sir.

"Q. Describe it to the jury in a general way? A. Well, this machine, they call the shaver, is a heavy cast-iron frame in the shape of a trough and that carries a shaft, belting and knife that revolves in this trough. At one end of the shaft that bears the knife there is a large gear wheel, I judge about ten inches, that engages in a worm shaft below and that shaft carries two pulleys, a tight and loose pulley, which are controlled by a belt shifter and a brake shoe.

"Q. How close do the two pulleys run together, the tight pulley and the loose pulley? A. I judge about one-sixteenth of an inch.

"Q. What was there on the guides or claws or spindle that engaged the belts? A. At the times I saw the machine there had been some kind of babbitt or stereotype metal put on to it.

"Q. Put on what? A. On the forks or prongs that engage the belt, on the belt shifter.

"Q. Now how thick was it on? A. Well, I would judge there was about an inch or an inch and a half.

"Q. What was the purpose of putting that metal on there? A. So that the shifters will, in a measure, properly guide the belt. The trouble is that the shifters, as they are there, themselves are too wide for the belt; should have been a five inch belt and they have a four inch belt. So they have to put this on to make it fit the belt.

"Q. What effect does this stereotyping metal have on rubbing the belt? A. Every time the laces come around, where the two ends of the belt meet, has the effect of striking it and wearing on the belt shifter.

"Q. Has it had any effect in reference to wearing the metal? A. Yes, it wears groves in that soft metal.

"Q. Now, what was the depth of the groove that was worn in there? A. There was one on the east prong that is

about a half inch in depth and the other on the same prong is about a quarter of an inch.

"Q.   What effect does the belt striking in and running into that grove and striking it there, what effect does it have upon the shifter or upon the likelihood of throwing the belt, from the loose to the tight pulley?   A.   Well in this particular machine it has a good deal of effect, for the simple reason that the notch that should hold that belt shifter in place is badly worn and this striking of the fork of that belt shifter is very liable to disengage the shifter handle, or lever, probably allowing the belt to run over on to the tight pulley.

"Q.   To what extent would that belt have to go from the loose pulley to the tight pulley in order to turn that machinery, the shafting upon which the knife is on?   A.   Well it would only have to touch that tight pulley, provided though that the brake shoe was not engaged; if the brake shoe was engaged why then it would have to bear pretty heavily on that tight pulley.

"Q.   What kind of a brake shoe is there on that, that brake shoe at that time?   A.   It is a triangular piece that is engaged with the shifting bar at one end and at the other end there is a leather or felt shoe that presses down on the tight pulley.

"Q.   For what purpose does it press on the tight pulley?   A.   To make an absolute stop to the machine.

"Q.   When the lever is shoved back, does it have that action, if it is in proper condition?   A.   Yes, sir.   It would if it was in proper condition.

"Q.   What is the multiplication of power given to that machine by means of that worm and gear wheel?   A.   Well, I didn't figure that out, but, judging from experience with that class of machines it is about forty times; one pound pressure on the tight pulley would be equivalent to forty pounds pressure at the knife; it is multiplied about forty times in that screw.

"Q. About what would you judge would be the revolution of the knife itself? A. I think about eight revolutions a minute is its speed.

"Q. With the belt running as you saw it there, before Connolly was hurt, upon that pulley, with the groove in that metal, as you saw it worn in that metal, to what extent would that permit the belt to be cast from the loose pulley to the tight pulley? A. Provided that the shifter was where it ought to be?

"Q. As you saw the machine there then? A. Why, I would think about one-quarter of an inch on the tight pulley.

"Q. Would that be sufficient in the condition you saw the brake that night to revolve the spindle upon which the knife was on? A. Yes, sir, with much force.

"Q. Now, Mr. Motter, you spoke about the notch in the lever? A. Yes, sir.

"Q. Being beveled or worn so it could not properly hold in its place. I show you this photograph, indicate on the lever at the point where you speak about? [Hands witness a photograph.] A. At the point where this notch is?

"Q. Where the notch was the night you saw it there that it was worn out? A. I saw it as they were operating the machine; that notch should be right at the handhold to engage that yoke.

"Q. Is that the notch that you speak about that was not square, but worn around when you saw it? A. Yes, sir.

"Q. What effect was that notch being worn round, in your opinion as a mechanic, so far as holding that brake lever in its place? A. Well I might be a little peculiar in my opinion, but I would call it literally worthless and very dangerous.

"Q. Now I will add to that with the belt and the clutches in the condition in which you have spoken? A.

Well that notch is for the purpose of holding the shifter in its place.   If it was worn so bad that there was no notch, it would not hold the shifter, but as it is worn, the greater the liability not to hold in its place; and at the time I saw it, it was much worn."

In passing upon a demurrer to the evidence not only the truth of the facts shown but every inference of fact, which the evidence warrants, and which the jury with propriety might make, must be made in favor of the plaintiffs. [Young v. Webb City, 150 Mo. 333; Alcorn v. C. & A. Ry. Co., 108 Mo. 81; Twohey v. Fruin, 96 Mo. 104; Buesching v. St. Louis Gas Light Co., 73 Mo. 219; Wilson v. Board of Education, 63 Mo. 137; Harris v. Railroad, 89 Mo. 233.]

The duties of the plaintiff in connection with the machine were to put the stereotype plate in the curved bed of the machine; start the spindle to revolving by pulling out the bar of the shifter; and when the edge of the knife left the plate on the back side, to stop the further revolution of the spindle by pushing in the shifting bar, and take out the shaved plate and to oil the machine when necessary.   He was no machinist. The defects in the machine pointed out by the expert machinist were not necessarily obvious to him in the discharge of these duties, and it was not his duty to search for them.  Neither was the danger from these defects manifest to him in the ordinary discharge of his duties.   Hence, this case is not within the principle of the long line of cases cited by counsel for the defendant in support of their contention, that the risk was assumed by the plaintiff, of which Fugler v. Bothe, 117 Mo. 475, Lucey v. Hannibal Oil Co., 129 Mo. 32, and Roberts v. M. & K. Tel. Co., 166 Mo. 370, are examples.   "An unavoidable inference" does not arise from the uncontroverted facts in this case that the plaintiff either knew the defects of the machine or knew the continuous danger arising from those defects.   On the contrary there was evidence tending to prove that he did not know of these defects, or that there was any-

thing the matter with the machine until about a week or ten days before the accident, when he observed for the first time, that the spindle was revolving although the shifting bar was pushed in, and the belt ought to have been completely on the loose pulley, and the spindle stationary. This condition of the machine, he immediately communicated to the foreman, who called in the machinist of the concern, repairs were made, and he was assured by the foreman that the machine was all right. By thereafter continuing in the discharge of his duties at the machine, until he was injured, he neither assumed the risk of such injury, nor was guilty of negligence contributing thereto. [Conroy v. Vulcan Iron Works, 62 Mo. 35; Keegan v. Kavanaugh, 62 Mo. 230; Dale v. Railway Co., 63 Mo. 455; Huhn v. Mo. Pac. Ry. Co., 92 Mo. 440; Stephens v. Railway Co., 96 Mo. 207; Soeder v. Railway Co., 100 Mo. 673; Shortel v. City of St. Joseph, 104 Mo. 114; Nicholds v. Plate Glass Co., 126 Mo. 55; Settle v. Railway Co., 127 Mo. 336; Bradley v. Railway Co., 138 Mo. 293; Doyle v. M. K. & T. Trust Co., 140 Mo. 1; Duerst v. St. Louis Stamping Co., 163 Mo. 607.] Our views on this subject have been so often expressed, that a reiteration of them in this case is unnecessary. The circuit court committed no error in submitting the case to the jury and its judgment is affirmed.

All concur.