MATHIS v. KANSAS CITY STOCK YARDS COMPANY, Appellant.

In Banc, December 24, 1904.

**MASTER AND SERVANT: Defective Tools: Assumption of Risks: Ordinary Care.** In order to regulate the amount of steam supplied to pumps the engineer was required to reach two wheels from eight to twelve feet above the floor, and while holding one of them stationary with one hand turn the other and at the same time look backward over his shoulder to observe the effect on the supply of steam, and he could mount to the wheels by standing on the steam chest on each pump or by placing a board from eight to ten inches wide from the chest on one to the chest on the other. He was an experienced mechanic, and had been in the employ of the defendant for three years, and was the night or second engineer, and had been in the habit of standing on the chests when he turned the wheels to regulate the governor, but seven days before the accident the chief engineer, with an oath, directed him to use the plank, and he did so in obedience to such direction, but made no objection to doing so, and asked for no additional safeguards, and used the

plank with safety for seven days, and on the evening of the accident while he was alone he got upon the plank, and in handling the wheels the plank tipped, he fell and was injured. He well knew the character of the plank, knew it was not fastened down and that to use it he had to adjust it upon the steam chests. *Held*, that the use of the plank was entirely voluntary, and plaintiff was as familiar as defendant with any risks incident to its use, and the appliance being reasonably safe, and the risk of injury being in handling it, he assumed the risk, and can not recover for his injuries.

---

Per Marshall, J., in a dissenting opinion, with whom Brace and Valliant, JJ., concur.

1. **MASTER AND SERVANT: Defective Appliances: Assumption of Risks.** Admitting that the plank was sufficient in width, size, strength and weight to afford plaintiff a reasonably safe place and secure footing, that does not answer the other ground of negligence relied upon by plaintiff as a basis for recovery, namely, that the plank was loose and unfastened to its supports and was liable to slip and spring, on account thereof, from its proper position—a charge that is admitted.

2. ——: ——: ——: **Loose Plank: Supports: Matter for Jury.** The plank rested upon the tops of two steam chests, which were not even and smooth, but had the name of the manufacturer on them in raised letters, and also had nuts and bolts projecting above them about an inch and an eighth in height. *Held*, that whether or not this appliance, to-wit, the loose plank in combination with the tops of the steam chest, was negligence, was one of fact, about which reasonable minds might differ, and, therefore, was a question for the jury.

3. ——: ——: ——: **Mixed Question of Law and Fact.** The question of whether or not the servant assumed the risk of using the appliance furnished him by the master, is a mixed question of law and fact. If the appliance was so patently dangerous that no reasonably prudent man would use it, the servant is not entitled to recover for injuries resulting from its use; but if the danger of using it was not glaring and threatening and he might reasonably have believed that he could safely use it by the exercise of ordinary care, he did not assume the risk, and is entitled to recover. In either case the question is one of fact for the jury.

Appeal from Jackson Circuit Court.—*Hon. W. B. Teasdale*, Judge.

Reversed.

*Pratt, Dana & Black* for appellant.

(1)   Plaintiff failed to make out a case of injury due to actionable negligence on the part of defendant, and therefore its requests, made at the close of his case, and at the close of all the testimony, that a verdict be directed in its favor, should have been granted. (a) Even if the things alleged constituted defects in the plank, yet they were patent to any observer, and the plaintiff must have known of them, and was chargeable with such knowledge if he did not actually know it. Wood's Master and Serv., secs. 382, 419; 2 Thompson on Neg., sec. 48; Railroad v. Wagner, 33 Kan. 666; Breen v. Coop. Co., 50 Mo. App. 202; Covey v. Railroad, 86 Mo. 635; O'Malley v. Railroad, 113 Mo. 319; Murray v. Railroad, 101 Mo. 236. (b) Plaintiff must have proved affirmatively that defendant's furnishing the plank or allowing its use in the way in which plaintiff used it was a failure on its part to discharge some duty which it owed him, and that such failure was the proximate cause of his injury. Gurley v. Railroad, 104 Mo. 223; Roddy v. Railroad, Id. 244; Patterson's Ry. Accdt. Law, p. 7; Harlan v. Railroad, 65 Mo. 22; Hudson v. Railroad, 101 Mo. 13; Schmitt v. Railroad, 160 Mo. 43; Webb's Pollock on Torts, p. 545; Wood's Master and Servant, sec. 408. (c) Defendant's duty did not require it to furnish any particular kind of appliances, nor the safest nor the most suitable. Grattis v. Railroad, 153 Mo. 404; Friel v. Railroad, 115 Mo. 503; Bohn v. Railroad, 106 Mo. 429; Cothron v. Packing Co. (Mo. App.), 73 S. W. 279; Bradley v. Railroad, 138 Mo. 302; Brown v. Lumber Co., 65 Mo. App. 162. (d) The fact that plaintiff fell and was hurt, or that the plank tipped and caused his fall (if it was a fact) did not overcome said presumption nor prove a failure by defendant in doing its duty to plaintiff. Yarnell v. Railroad, 113 Mo. 570; Murphy v. Railroad, 115 Mo. 119. (e) Plain-

tiff assumed the risk of using the plank because if, as he claims, it was a defective or unsuitable appliance in the respects charged in his petition, yet those alleged defects were obvious to him, he did not complain of them, and there was no promise or assurance given by defendant with reference to them. Wood's Master and Serv., sec. 382; Roberts v. Tel. Co., 166 Mo. 370; Nugent v. Milling Co., 131 Mo. 245; Steinhauser v. Spraul, 127 Mo. 562; Beach on Cont. Neg. (2 Ed.), sec. 359; Junior v. Light Co., 127 Mo. 83; Bradley v. Railroad, 138 Mo. 302. (2) The release executed by plaintiff was a bar to any right of action he might have had, and for that reason defendant should have had a verdict in its favor. Hazard v. Griswald, 21 Fed. 178; Wood v. Gordon, 18 N. Y. Supp. 111; Wallace v. Railroad, 67 Ia. 547, 25 N. W. 772; Och v. Railroad, 130 Mo. 52; Nicol v. Young, 68 Mo. App. 453.

*Frank P. Walsh* and *E. R. Morrison* for respondent.

(1) (a) The evidence clearly shows that defendant was guilty of negligence in the respects charged in the petition and the demurrer to the evidence was properly overruled. Doyle v. Trust Co., 140 Mo. 1; Huhn v. Railroad, 92 Mo. 440; Pauck v. St. L. D. B. Co., 159 Mo. 467; Murphy v. Railroad, 115 Mo. 118; Settle v. Railroad, 127 Mo. 343; Wendler v. People's H. F. Co., 163 Mo. 527. (b) The master's duty is to exercise reasonable care to provide as safe a place to perform the service as the character of the work done will permit. Curtis v. McNair, 173 Mo. 270; Bradley v. Railroad, 138 Mo. 302; Mather v. Rillston, 156 U. S. 391; Blanton v. Dold, 109 Mo. 75. (2) Where it is shown that the master has negligently failed in the performance of a personal duty, the servant never assumes the risk of such negligence. 1 Bailey's Pers. Inj., sec. 469; Soeder v. Railroad, 100 Mo. 673; Devlin v. Rail-

road, 87 Mo. 545; Keegan v. Kavanaugh, 62 Mo. 232. (3)    The evidence shows a wrongful and fraudulent procurement of the release by the agents of appellant, and same is null and void.   Och v. Trust Co., 130 Mo. 50; Vautrain v. Railroad, 78 Mo. 44, affirming 8 Mo. App. 538; Goodson v. Nat. Mas. Assn., 91 Mo. App. 351. The payment of $70 was voluntarily made by appellant and delivered to plaintiff and under the law was a gift and hence no consideration for signing the release. Meyer v. Koehruny, 129 Mo. 25; Blatz v. Lester, 54 Mo. App. 285; Riley v. Kershaw, 52 Mo. 224; Cunningham v. Union Cas. & S. Co., 82 Mo. App. 612.

FOX, J.—This cause was transferred to Court In Banc from Division No. 1 of this court.   The opinion in Division No. 1, by the learned and esteemed judge, fairly states the facts in this cause, and with his permission the same will be adopted.   It is as follows:

"The plaintiff recovered a judgment for five thousand dollars damages for personal injuries, sustained by him on August 29, 1899, in consequence of alleged negligence of the defendant in not furnishing him a safe place and safe appliances for doing his work as a servant of the defendant.   The defendant appeals.

"The plaintiff was employed by the defendant as second or night engineer for the defendant.   The petition charged that it was a part of the plaintiff's duty to adjust certain machinery and to turn a certain governor that regulated two certain steam pumps, which governor was located at a certain height above the floor, and that in order to reach the governor, the defendant provided a narrow pine board from eight to twelve inches in width, seven-eighths of an inch thick, with its ends resting upon the tops of two steam chests, connected with the engines and pumping works of the defendant, and that while plaintiff was engrossed in his said duty, the board slipped and the plaintiff fell and was injured.

"The petition charged three specific acts of negligence, to-wit: First, the heads or tops of the chests were dirty and greasy, etc., in consequence of which the plank slipped; second, that the board was insufficient in width, size, strength and weight to afford plaintiff a reasonably safe place and secure footing; third, that the board was loose and unfastened to its supports and was liable to slip and spring on account thereof from its proper position.

"Upon the trial, the court, by instruction, withdrew the first charge of negligence from the jury. So that only the second and third charges are material here.

"The answer is a general denial, a plea of contributory negligence, a plea of assumption of risk, and a plea of release.

"The reply denies the affirmative pleas, and as to the release pleads that it was obtained by fraud.

"The case made is this:

"The defendant has on its premises and operates two Worthington pumps, placed side by side, some twelve or fifteen feet long and about five to six feet apart. Each pump has on top of it two steam chests, each about eight inches wide and about twelve inches long. The steam that operates the pumps is supplied by a pipe running down about midway between the pumps. About four feet above the level of the steam chests a pipe runs from said down pipe to each of the two pumps. Each of said two last named pipes has a throttle, so that steam can be shut off from either or both of the pumps. Above where said two pipes leave the main supply pipe, there is a governor, which is an appliance for regulating the supply of steam, and which is operated by two brass wheels, one of which is held tight in one hand while the other is turned by the other hand. This regulator is placed at a height, varying according to the several witnesses, from eight and a half to twelve and a half feet above the level of the floor.

The tops of the steam chests were four to four and a half feet above the level of the floor. The defendant contends that the governor was four and a half feet above the top of the steam chests, and, therefore, the governor was eight and one-half feet above the level of the floor, while the plaintiff contends that the bottom of the governor was eight and a half feet above the level of the floor, the brass wheels which operated the governor were two feet above his head, which he says would make the wheels twelve feet six inches above the floor, and eight feet six inches above the tops of the steam chests. This difference, however, is not decisive of the case and so need not be settled here. The tops of the steam chests were not smooth, but had the name of the manufacturer on them in raised letters and also had nuts and bolts projecting above them about an inch and an eighth in height.

"L. C. Chapman was the chief engineer and plaintiff's superior officer. G. H. Harper was the first engineer, and ran the pumps during the day. The plaintiff was the second engineer and ran the pumps during the night. The plaintiff had had experience as a mechanic, a stationary engineer, a locomotive engineer, a fireman, a blacksmith helper and an engine hostler. He had been in the employ of the defendant for nearly three years, first as a fireman, and from March or April, prior to the accident, which occurred on August 29, 1899, he was night engineer.

"The governor was too high above the floor for a man to operate while standing on the floor. The defendant contends that to reach the wheels of the governor it had provided two safe methods, to-wit, a ladder, which could be rested against the supply pipe above the governor, and a plank which could be rested upon the tops of the steam chests upon the two pumps. The plaintiff and his witness, Gable, say that there was no ladder at the time of the accident and had not been for sometime previously. The plank was from eight to

twelve inches in width, about seven-eighths of an inch thick and long enough for its ends to rest upon the steam chests of the two pumps. The plaintiff testified that during all the time he was night engineer until seven or eight days before the accident, when he wanted to reach the governor he climbed up on the pump, but when he was about to do the same thing seven or eight days before the accident, the chief engineer, Chapman, 'hollered to me, stormed out at me, by God, to use that plank and not be kicking the paint off of them pumps; that is what the plank is there for, he wanted it always used.' He says he used the plank five or six times thereafter and was using it at the time of the accident. The defendant contends that no such thing occurred, but that the plaintiff used the plank without compulsion or protest. There is no question that the plank was not fastened in any way, but just rested loosely upon the tops of the steam chests. No one was with the plaintiff at the time of the accident and, therefore, he alone can say how it happened. He says he put the plank on the tops of the steam chests, and then he got upon it and stood about midway between the two pumps, and was engaged in operating the brass wheels of the regulator so as to reduce the steam from high to low pressure. In order to do this, he had to hold one of the wheels in one hand, and turn the other wheel with the other hand, and all the while he had to look back over his shoulder to see the steam gauge on the pump so as to tell when he had reduced the pressure sufficiently, and while so engaged the plank slipped or tipped and he fell down and was injured by the machinery. The defendant introduced testimony to the effect that soon after the accident the plaintiff said that in getting down off of the plank his foot slipped and he fell.

"The plaintiff introduced evidence tending to show that in all other places that he had ever seen there was a platform with a railing along the sides and steps lead-

ing up to it, to enable the engineer to reach the governor.

"As to the release pleaded the plaintiff said that his wages for August were drawn for him while he was laid up; he received a message that the chief engineer, Chapman, wanted to see him; that he went to the defendant's place of business and was told by Chapman that some one wanted to see him in the office; that four or five days afterwards he went to the office and there met Maj. Drought, the superintendent of construction, and after some talk and other preliminaries, not necessary to specify here, he told the plaintiff that Mr. Childs, the assistant manager, wanted to see him; that he went to see Mr. Childs and he asked plaintiff if it was not his own fault that he was hurt, and plaintiff said it was not; that then Mr. Childs asked him what he wanted and he said he wanted his wages for September; that Mr. Childs asked him on what grounds he thought he ought to have wages for September, and he replied that everybody working in the plant had always had vacations every year ranging from one to three weeks, and had been paid during the time they were away, and that he had never had a vacation and he did not think it right to dock him for lost time while he was crippled; that thereupon Mr. Childs said: 'All right, Mathis, we'll pay you your wages for September,' and directed him to go with Maj. Drought, and he would fix it up, and that they wanted him to come back as soon as he could; that he went with Maj. Drought to Mr. Dean's office, who usually paid the men their wages, and Maj. Drought said to Mr. Dean, 'Give Mathis his September wages;' that Mr. Dean handed him three twenty dollar bills and he told him he would 'have to come again,' that his wages were not sixty dollars, but seventy dollars a month; that after some talk Mr. Dean handed him ten dollars more and handed a paper to Maj. Drought, saying, 'Here is the receipt for your September wages, sign it;' that he signed it, took the money and went

home; that he never knew that it was claimed that what he signed was a release until after this suit was commenced; that he had never seen the paper he signed since. Upon being shown the release pleaded, the plaintiff denied that he had ever signed the same, and said that it was not his signature, and that he had signed a paper when he got the seventy dollars, but it was not this paper; that nothing was said to him before he signed the paper except as here stated; that in signing the paper he had perfect confidence in Maj. Drought.

"The paper pleaded is headed, 'Receipt for Accident Indemnity and Release of Cause of Action,' and purports to be a receipt for seventy dollars in full for all damages and loss of time for accidental injuries received on August 29, 1899, and in final satisfaction and discharge of all claims for said injuries, in consideration of which he disclaimed all right to damages for the injuries and released the defendant from all liability therefor.

"Chapman denied having any such conversation with the plaintiff, and Maj. Drought and Mr. Childs testified that they had no such conversation as he details, but that they asked him what liability he claimed against the company and told him they wanted to settle any claim he might have, and he agreed to take one month's full wages, the payment of his doctor's bill ($50), and release the company from all further liability; that accordingly the release was prepared, he signed it, took the money and went home. The company afterwards paid the doctor's bill. The plaintiff admitted that the paper he signed was not the pay roll and that he never signed a paper like it before. He also admitted that during October he was paid half wages when he did not work and full wages on the days he did work. After that he returned and worked at his regular wages until December, 1900, when he was discharged or quit, the parties do not agree which, when he brought this suit.

"As stated the jury found in favor of the plain-

tiff, awarded him five thousand dollars and the defend-
ant appealed."

OPINION.

Upon this state of facts, two propositions are pre-
sented for consideration:

First.  Did the plaintiff assume the risk of injury
in the performance of the duties imposed upon him by
reason of his employment?

Second.  Under the facts of this case, is he barred
of a recovery by the release offered in evidence?

The difficulty with which courts are confronted in
cases of this character, is not from any unsettled condi-
tions of the rules of law applicable to the questions in-
volved; but is in the application of the rules repeatedly
announced by this court to the particular facts devel-
oped in the cause.

The relation of master and servant, and the duties
imposed upon them, by reason of their contract of em-
ployment in the performance of labor, in which there
is some risk of injury, is very clearly stated in the case
of Roberts v. Telephone Co., 166 Mo. l. c. 378 and 379.
MARSHALL, J., speaking for the court, said: "It is not
denied in this case, for the law is too well settled to ad-
mit of discussion, that it is the duty of the master to
furnish to the servant a reasonably safe place and rea-
sonably safe appliances on which and with which to do
the work required of the servant, and, conversely, it is
equally well settled that it is the duty of the servant
to 'take ordinary care to learn the dangers which are
likely to beset him in the service. . . . He must not
go blindly or heedlessly to his work, when there is dan-
ger.  He must inform himself. . . . The servant is
held, by his contract of hiring, to assume the risk of
injury from the ordinary dangers of the employment;
that is to say, from such dangers as are known to him,
or discoverable by the exercise of ordinary care on his

part. He has, therefore, no right of action, in general, against his master for an injury befalling him from such a cause. His right to recover will often depend upon his knowledge or ignorance of the danger. If he knew of it, or was under a legal obligation to know of it, it was part of his contract, and he can not, in general, recover.' [Thomas v. Railroad, 109 Mo. 1. c. 199; Price v. Railroad, 77 Mo. 508; Steinhauser v. Spraul, 127 Mo. 1. c. 562.]

" 'The servant when he enters the employment of his master assumes not only the risks incident to his employment, but all dangers which are apparent and obvious as a result thereof. The master is no insurer against all accidents that may overtake or befall the servant in his employ.' [Nugent v. Milling Co., 131 Mo. 1. c. 245.]

" 'If the servant, before he enters the service, knows, or if he afterwards discovers, or if, by the exercise of ordinary observation or reasonable skill and diligence in his department of service, he may discover, that the building, premises, machine, appliance or fellow-servant in connection with which or with whom he is to labor, is unsafe or unfit in any particular, and if, notwithstanding such knowledge, or means of knowledge, he voluntarily enters into or continues in the employment without objection or complaint, he is deemed to assume the risk of the danger thus known or discoverable, and to waive any claim for damages against the master in case it shall result in injury to him.' [2 Thompson on Neg., 1008.]"

SHERWOOD, J., in Steinhauser v. Spraul, 127 Mo. 1. c. 562 and 563, said: "It is well-settled law that an employer is not bound to furnish his employees the safest known appliances, tools or machinery, the latest approved patterns of tools and improvements therein, etc., nor does he render himself liable by failing to discard tools or appliances which are not such, and to supply their places with those which are more safe. [2

Thompson on Neg., p. 983; Blanton v. Dold, 109 Mo. 64.]

"In cases like the present it seems that, the risk of injury being but small, the use of very primitive. and inefficient implements is allowable, and such use will fill the measure of ordinary care. The master is not the warrantor of the tools furnished his servants; having exercised ordinary care in the selection of the implements, his liability, so far as mere selection is concerned, ceases. [Beach on Contrib. Neg. (2 Ed.), secs. 351, 352, and cases cited.]

"Again, no principle is more frequently enunciated, or more often applied in the adjudicated cases, than that which holds that an employee, in engaging in the service of another, assumes the risks incident to such employment, and this is especially true of seen dangers and patent defects. Where ordinary inspection and carefulness will enable the employee to avoid the danger, there he will be required to use such inspection and carefulness. 'But it is held that, wherever the employee's means of information are equal to or greater than those of his employer, the employer . . . will not be liable in case of injury from a defect of that sort. But this is, perhaps, but little more than to say that the servant, as well as the master, is bound to ordinary care. For patent dangers or defects, the master, as a rule, is not liable, and in many cases it has been held that they need not be pointed out, even to minor employees, if the latter be capable of discerning them.' [Beach on Contrib. Neg. (2 Ed.), sec. 359.]"

In Bradley v. Railroad, 138 Mo. l. c. 302, MACFARLANE, J., announced this rule: "It is equally well settled that a master can conduct his business in his own way, and the servant, knowing the hazards of his employment as the business is conducted, impliedly waives the right to compensation for injuries resulting from causes incident thereto, though a different method of

conducting the business would have been less danger-
ous.''

The qualification or exception to the general rules
defining the correlative rights and duties of master and
servant in the cases heretofore cited, is very aptly
stated by Judge MARSHALL in Holmes v. Brandenbaugh,
172 Mo. 65. It is said: · ''It is also the law, not only in
this State but almost universally, that if the master fails
in his duty to his servant to furnish safe appliances, and
if the servant knows, or by the exercise of ordinary care
could know, that the appliances furnished are not alto-
gether or reasonably safe, the servant is not obliged to
refuse to use the apliances or quit the service of the
master if he reasonably believes that by the exercise of
proper care and caution he can safely use the appli-
ances notwithstanding they are not so reasonably safe,
and if he does use them and exercises such care and cau-
tion and is injured, the servant does not waive his right
to compensation for injuries received in consequence,
nor is he guilty of contributory negligence. But if the
appliance is obviously so dangerous that it can not be
safely used even with care or caution, or as it is some-
times said, if the danger of using it is patent, or such
as to threaten immediate injury, then the servant is
guilty of contributory negligence if he uses it, and the
master is not liable notwithstanding his prior failure
of duty. [Huhn v. Railroad, 92 Mo. 447; Soeder v.
Railroad, 100 Mo. l. c. 681; Holloran v. Iron Co., 133
Mo. l. c. 476.]''

These are the rules of law applicable to the first
proposition involved in this controversy; their fair and
reasonable application to the facts as shown by the
plaintiff, must furnish its solution.

The plaintiff in this cause was thirty-eight years
old, ablebodied and intelligent; an experienced me-
chanic, thoroughly familiar with the surroundings and
with the work he was doing; was in charge of the plant
at the time and alone in the pump room when hurt.

Had been in defendant's employ in the machinery plant for nearly three years, first as fireman, and for some time preceding the accident as night engineer. A part of the work in which plaintiff was engaged was to regulate the steam pressure of the two pumps. There were two steam chests on each pump. The steam chests were only a few feet above the level of the floor of the pump room. In manipulating the governor to regulate the steam pressure, plaintiff says he had been in the habit of reaching the governor to regulate it, by standing on top of the steam chest of the pumps; but seven or eight days before the accident, the chief engineer directed him to use the plank which was there, and this direction, so plaintiff testifies, was emphasized by the use of an oath. In obedience to such direction he afterwards used the plank. At the time he was directed to use the plank, he made no objection to the use of it, was not provided any other appliance, nor did he request any additional safeguards. He used with perfect safety this plank seven or eight days before the accident, in the performance of the work in which he was engaged.

Plaintiff further testifies, that on the evening of August 29, 1899, he had occasion to reduce the steam pressure and that he got upon the plank as he had done before, and in handling the governor wheels, the plank tipped, he fell off and was injured. The plank furnished was nearly an inch thick, from eight to twelve inches wide, long enough to reach from the steam chest on one pump to the steam chest upon the other. It was not contended that it was in any way unsound. The plaintiff well knew the character of the plank, its thickness, length and width, had used it a number of times before in the performance of his work; knew it was not fastened down, and in the use of it had to adjust it upon the steam chests. Plaintiff was equally familiar with the surface of the steam chests upon which this plank had to be adjusted and supported. The adjustment of it rested with him.

It is apparent that, notwithstanding the emphatic language used by defendant in directing the use of this plank in the performance of the work by the plaintiff, its use was entirely voluntary, and that plaintiff was as familiar as defendant with any risks incident to its use. We have, upon this undisputed state of facts, the plaintiff performing work with appliances with which he is perfectly familiar; the dangers or risks in the performance of the work were as obvious to him as they were to the defendant. The appliance, a plank, was of the simplest character; the steam chests, the places on which it was supported, were apparent. No one knew more about the possibility or probability of the plank "tipping" when being used, than the plaintiff, for the safety or unsafety of its use depended entirely upon the adjustment of it by the plaintiff.

From the facts in this case it is clear that the tipping of the plank when being used, depended largely upon how evenly and carefully it was placed upon the steam chests, and how carefully the plaintiff stood or moved on it when he used it. Keeping in view the main guide to a correct conclusion in this cause, *the facts,* we again say that the plaintiff in this case was in the prime of life, an experienced mechanic; the appliance was of the simplest nature. He proceeded to the performance of the work at the time of the accident with a complete knowledge of the character of the appliance and the manner in which it had to be adjusted; had used it with perfect safety a number of times before. The risk of the plank slipping or tipping was but an ordinary one incident to the performance of the work. The appliance was reasonably safe, the risk of injury was in the handling of it by the plaintiff. We feel, under this state of facts, that there is no escaping the conclusion that the plaintiff fully appreciated the risk which was incident to the work he was performing, assumed it, and cannot recover in this action.

The conclusion reached in this cause is fully sup-
ported by the unbroken line of expression by this court,
in numerous cases, where the facts very nearly ap-
proach those developed in the case at bar.

The case of Fugler v. Bothe, 117 Mo. 475, was
transferred to this court from the St. Louis Court of
Appeals, one of the judges of that court dissenting from
the majority opinion. In that case the plaintiff's
husband was killed by falling from a plank upon
which he was standing, in the performance of work as
a carpenter. The plank was about fifteen inches in
width, was nailed down, and the elevation was much
higher than in the case at bar. The deceased, at the
time of the injury, was engaged in boarding the sides
of a light-and-air shaft in a building being constructed
in the city of St. Louis. The deceased and another car-
penter, before commencing work upon the first shaft,
which was similar to the one in which the injury oc-
curred, began to erect a scaffold from the ground floor
to the base of the shaft, for the purpose of doing the
work assigned them. One of the defendants forbade
the construction of the scaffold, and he told the work-
men that they could either do the work by standing on
the plank, or they could quit. Thereupon the deceased
and his coworker began the work as directed, and they
so continued until they finished the three shafts. The
deceased commenced work on the fourth shaft and while
standing on the plank, he fell and was killed. The plain-
tiff's husband in that case, as the plaintiff in this case,
was perfectly familiar with the character of the work
and the methods provided for the doing of it; similar
work under the same conditions, had been performed
in the other shafts. Judge ROMBAUER delivered the
dissenting opinion in that case, which was approved and
adopted by this court in banc. The learned judge re-
viewed fully all the cases upon which the conclusions
of the majority opinion were bottomed and his final
summing up, on the proposition involved, is specially

applicable to the case before us, and if it is to be followed, is decisive of the case at bar. After an able and exhaustive review of the cases cited in the majority opinion, he said:

"I am still at a loss to understand how the points decided in either of them furnish any warrant for the conclusion of my associates in this case. It is not the declarations of the law which may have been made in one or the other, but the application of the propositions stated to the points in judgments which make the law, when we speak of it as founded on precedents. The great difference between all of these causes and the case at bar is, that here the unavoidable inference arises from the uncontroverted facts, that the servant not only knew the defect, if such it may be called, but also knew the attendant and continuous danger arising from it to him, much better than the master could possibly know it. It was the servant and not the master who continually moved on the plank and knew whether he could safely handle his body on it without losing his balance. The relative safety of the appliance did not depend on circumstances of which the master had control, but of such as were within the exclusive knowledge and control of the servant. The case falls wholly outside of the principle that the servant had a right to rely on the superior knowledge of the master. What is meant by a safe place which the master is required to furnish his servant to work in or about, is not the obvious or patent safety or unsafety of the place; because, in the nature of things, many kinds of labor have to be performed under conditions relatively unsafe and often dangerous."

Holloran v. Iron & Foundry Co., 133 Mo. 470, was also a "plank case." The facts in that case may be briefly stated thus: On the day he received his injuries, plaintiff was engaged, in conjunction with several other laborers, in moving an upright derrick on loose planks laid for that purpose across the uncovered iron

girders of the first floor of the DeMenil building. The first story had no floor as yet, the iron columns and cross beams only having been put in place and fastened. The derrick was provided with small wheels or rollers. On this occasion a run or track was laid consisting of planks laid side by side and extended end to end across the girders, on which the derrick was to be moved. The derrick was pushed along on these planks by plaintiff, and was pulled and guided by Droney, the foreman of the gang, on the front, or the end in the direction they were moving it. This work had proceeded safely up to a certain point when it was observed by the foreman, who was engaged with the other men in this work, that the derrick was running to one side, and he thereupon called to plaintiff, who was standing upon a plank immediately behind the derrick, prying it from behind by means of a crowbar, to "cut it in." This he attempted to do by stepping to one side, allowing one foot to rest on the plank on which he had been standing, and bracing the other against one of the iron girders running alongside the plank, and inserting his crowbar under the derrick from the side. Whilst in this position his foot, braced against the girder, slipped, and he fell into the cellar below, receiving the injuries complained of. Testimony was introduced to the effect that plaintiff and the other men engaged with him had complained sometime before this to the foreman that they were not provided with enough planks for this work. The application of the law to the particular facts of that case, was clearly made, and tend strongly to emphasize the correctness of the application of the law to the facts in the case before us. GANTT, J., speaking for the court, said:

"He was a man of mature years, he was not a minor or a raw and inexperienced man employed in a work which was strange to him. He knew and fully appreciated the usual risks of his employment, and with this knowledge, and with the risks open and obvious to

him and, for that matter, to every one working about the building, at that period in its construction, he undertook to assist in moving the derrick. He knew the floor had not yet been laid and the only way of moving the derrick or columns was by the use of the loose planks provided for that purpose. The danger was that he might fall between the uncovered iron girders or rafters. It was perfectly apparent that a careless step would precipitate him into the cellar below. . . . The appliances to move the derrick were perfectly simple and were as well understood by plaintiff as the defendant. Plaintiff knew the relative position of the plank and girder upon which he stood and knew better than anybody else whether he could handle himself safely in his position. The girders and planks were entirely sound, the only danger was he might slip and fall and he voluntarily incurred that risk. The manner of handling himself was under his own control.''

It is apparent that Judge GANTT, in that case, was dealing with a more favorable state of facts for plaintiff upon which a recovery was sought, than in the case before us for consideration. A recovery was denied and correctly so, as demonstrated by the clear, fair and reasonable application of the well-settled rules of law to the facts developed in the case.

In Steinhauser v. Spraul, 127 Mo. 541, plaintiff was a domestic servant in the employ of defendant, to do general housework. Under the directions of defendant, she was ordered to climb up a ladder into the pigeon loft, to get some pigeons for cooking. Plaintiff had been working as a domestic in the Spraul family two years and five months when her mishap occurred. During that time she had ''got the pigeons out of the loft four or five times a year,'' as she said. She also admitted that she had previously used the same ladder to reach the loft (from which she fell) ''four or five times.'' Prior to using that ladder, she had used, for the same purpose, an older one, since discarded. The

pigeon loft was in the upper part of a shed in the yard of the Spraul premises. The ladder plaintiff had to use was not defective. It was made for the purpose, and was new. The only supposed defect charged against it is that it was too long to reach the loft unless placed at a great angle; so plaintiff had to set it sidewise, against another shed. SHERWOOD, J., who delivered the principal opinion in that case, indicated very clearly, as well as forcibly, the correct application of the rules of law to the facts developed in that controversy. He said:

"As already seen, the plaintiff was fully conversant with the alleged defect in the ladder; its length, for otherwise it was sound. She had ascended it four or five times before, and gotten the pigeons out of the loft without trouble, and this thing occurred four or five times a year, as plaintiff says she had been using the new ladder a year or more when the accident happened. She had also used the old ladder before it had been discarded. So that it is simply indisputable that if ever the doctrine of the assumption of obvious risks is to be applied, it ought to be applied in the present instance. Being thus applied, the result seems to be inevitable that plaintiff on this ground alone has no cause of action and no standing in court."

The correctness of the conclusions reached by the learned judge in the principal opinion, is emphasized in the separate opinion by BARCLAY, J.; his apt and concise treatment of the question involved is clearly appropriate to the case now under consideration. He said:

"The appliance in question was a simple one. It required no more than ordinary knowledge for its use. It was sound. The only danger to plaintiff arose from the mode and manner of its use; and the mode and manner of using it, on the occasion in question, were within plaintiff's own control. She had used it with safety before; and, undoubtedly, knew as much about its use for such purposes as did the defendant. In my opinion

plaintiff can not recover for an injury arising from the manner in which she saw fit to place the ladder in executing the order of defendant to get the pigeons.''

It will be noted that the plaintiff was employed to do general housework, and it was a question involved as to whether the work directed of going upon the ladder to get the pigeons out of the loft, was within the line of her employment. . This doubtless accounts for the dissent and divided court in the case.

It will be observed in that case, that plaintiff had used the appliance (the ladder) with safety four or five times before, and, as said by the court, undoubtedly knew as much about its use for such purposes as did the defendant. So it may be said in this case, that plaintiff had used the appliance (the plank) five or six times before, with perfect safety, and was perfectly familiar with the character of the appliance, as well as the method of using it. Hence the remarks of the learned judge in the Spraul case, that ''the only danger to plaintiff arose from the mode and manner of its use; and the mode and manner of using it, on the occasion in question, were within the plaintiff's control,'' may very appropriately be applied to this case. To this also may be added what was said by this court in Holmes v. Brandenbaugh, supra. The injury complained of in that case was charged to have resulted from improper appliances, in an elevator. The regular machinery for stopping or regulating one of the conveyors had been out of repair, and for about eighteen months before the accident the only method provided for stopping a conveyor without stopping the whole machinery, was a stick or pole and a piece of rope, and it was charged that these appliances were unsafe, and that defendant should have furnished a lever attachment for doing this work. These appliances had been used in performing the work a year and a half, but the plaintiff had only used them for two days before the accident. In summing up the facts and announcing the conclusions in

that case, this court very aptly stated: "It is too clear to admit of a difference of opinion among reasonable men that it is not negligence on the master's part to furnish the servant with a rope to tie the stationary belt to the railing so as to prevent its rubbing against the moving belt, and to require him to do so. The rope was a safe appliance for such a purpose. That the appliance could be safely so used without risk or danger of injury, is not only demonstrated by the fact that it had been so used many times for a year and a half, and by the fact that the plaintiff had so used it two days before on the west belt, but it is also a plain, obvious physical fact, that no man of ordinary intelligence could be found to deny. So that, if the rope on this occasion caused the accident, it was not because the rope was not a suitable appliance for the purpose it was intended for, but because the rope was improperly handled or applied by the plaintiff himself."

So it may be said in this case, that if the plank caused the accident it was not because it was not a suitable appliance for the purpose it was intended for; but because it was improperly adjusted or handled by the plaintiff himself; that it could be used without danger or risk of injury, is demonstrated by the fact that plaintiff had used it for a week prior to the accident.

Our attention in the consideration of this proposition has been directed to the cases of Doyle v. Trust Co., 140 Mo. 1; Connolly v. St. Joseph Press Ptg. Co., 166 Mo. 447; and Bradley v. Railroad, 138 Mo. 302. An examination of these cases will demonstrate that they, in no way, conflict with the conclusions reached in this case.

It will be observed in the Doyle case that it is clearly distinguished from the line of cases herein referred to, by reason of the facts. BURGESS, J., very aptly makes the distinction, and correctly concludes that the facts in that case did not place the plaintiff within

rules of law applicable to the facts in the case at bar. He thus states his conclusion:

"The facts in this case do not, we think, bring it within the rule contended for by defendant. We are unwilling to say that the defects in the construction of the scaffolding complained of were so exposed and readily perceived by the eye, as to be so obvious as to convey to a person of ordinary common sense and prudence, not only that the defects existed, but that it was dangerous for persons to use the scaffolding by stepping or walking upon it. Nor would plaintiff's opportunity to know of the defects justify us in holding him as possessing such knowledge, if he did not in fact know of them. He had been on top of the building but a few hours when he fell, during which time he had been constantly engaged in carrying lumber, and had no opportunity, so far as the record discloses, except by casual observance, of ascertaining whether the switchboard was securely fastened or adjusted, or not, and had no reason to believe the place in which he was sent to work was not a reasonably safe one. He was not a carpenter, and was without experience in that kind of work, or knowledge of the situation, when sent there by Devore, the foreman of defendant, who knew the switchboard was not nailed or otherwise fastened, or might have known had he not been negligent." It is apparent that is not this case.

In the Bradley and Connolly cases, the facts created the exception to the application of the rule, and the learned judge in those cases, while fully recognizing the correctness of the application of the rule to facts similar to those developed in this dispute, very clearly distinguished those cases, by reason of the particular facts upon which they are predicated, from the line of cases which fully support the conclusions reached in this case. In other words, an examination of the long line of cases, both in this and foreign jurisdictions upon this subject, will demonstrate that each case must

stand upon its own particular state of facts, and from the facts, the case must fall within the general rule of law applicable to it, or within the well defined exceptions or qualifications to such general rules.

There are numerous other cases by the courts of this, and other states, which, in our opinion, fully support the conclusion reached upon this proposition; but we deem it unnecessary to pursue the subject further.

We repeat, that it is difficult to conceive of an appliance more simple than the one complained of in this case. It was a plain plank, lying around loose; when its use was required, it was placed in position by the plaintiff; no pretense that it was unsound; ten or twelve inches wide; the surface of the steam chests upon which it was to be adjusted was solid and firm; the conditions of such surface as to smoothness was well known to plaintiff; the character of the work to be performed was thoroughly familiar to him; he made no complaint as to the unsafety of the appliance or the place he had to work. He had performed this work with perfect safety for a week prior to the accident.

The testimony is absolutely silent as to the cause of the tipping of the plank; whether it was occasioned from the uneven surface upon the steam chests, or from insufficient width of the plank, or the manner of movement of the plaintiff upon it, it is apparent that the accident was not caused by reason of any unsoundness of the plank. He was a man of mature years, intelligent and experienced in the character of work he was performing, and the conclusion is inevitable that from the undisputed facts in this case, there arises an unavoidable inference, that plaintiff not only knew all the defects, if there were any, in the appliances used, as well as the nature and character of work to be performed, but also fully appreciated the danger and risk incident to the performance of such work.

If we are to longer recognize that there is such a doctrine as the assumption of risk, as was announced in

the cases of Fugler v. Bothe; Holloran v. Foundry Co.; Steinhauser v. Spraul; and numerous other cases, then there is no escape from the conclusion that it must be applied in this case, and plaintiff is not entitled to recover.

The conclusion announced upon the first proposition, renders it unnecessary to express an opinion upon the only remaining question involved, that is, as to the effect of the release pleaded in this cause.

The law upon this subject was fully and correctly declared by this court in banc in Mateer v. Railroad, 105 Mo. 320; it will suffice to say, that we fully approve the rules of law announced and the application of them to the facts of that case.

For the reasons herein indicated, this cause should be reversed, and it is so ordered.

*Robinson, C. J., Gantt* and *Burgess, JJ.,* concur; *Marshall, Brace* and *Valliant, JJ.,* dissent.

### DISSENTING OPINION.

MARSHALL, J.—I am unable to concur in the majority opinion in this case. As I prepared the statement of the facts in the case, I, of course, concur as to the facts. And as I also wrote the opinion in Roberts. v. Telephone Co., 166 Mo. 370, and in Holmes v. Brandenbaugh, 172 Mo. 53, I also, naturally, agree to the excerpts that are reproduced from those cases in the majority opinion. But I cannot agree to the conclusions drawn from the facts by the majority opinion, nor can I agree that the majority opinion properly applies the law applicable to the facts in judgment here. The cases quoted from state the law correctly as applied to the facts of those cases, but, in my judgment, the majority opinion in this case overlooks the crucial question of fact in this case, and also stops short of applying the full modern rule of law in respect to assumption of risks.

At the threshold of this discussion it is necessary to restate the negligence of the defendant relied upon by the plaintiff as affording a basis for recovery. It is twofold, to-wit: first, that the plank was insufficient in width, size, strength and weight to afford plaintiff a reasonably safe place and secure footing; and, second, that the plank was loose and unfastened to its supports and was liable to slip and spring, on account thereof, from its proper position.

The majority opinion finds that the evidence does not support the first assignment of negligence, and then decides the case without observing the second assignment of negligence at all. Now the fact is that the evidence is just as clear and uncontroverted that the plank was loose and unfastened to its supports and hence was liable to slip from its proper position, as it is that the plank was of a sufficient width, size, strength and weight to afford plaintiff a reasonably safe place and secure footing. Hence the jury might, and doubtless did, find the first assignment of negligence in favor of the defendant, and as the verdict was for the plaintiff, it must have been that the jury found that the second assignment of negligence was true. And the jury could not have found the fact, in that regard, otherwise, for it is admitted.

The fact is, therefore, not only found to be, but is admitted to be, that the plank was loose and unfastened to its supports. The fact is also found and admitted to be that the plank rested upon the tops of the two steam chests, and that those tops were not even or smooth, but that they had the name of the manufacturer on them in raised letters and also had nuts and bolts projecting above them about an inch and an eighth in height. The majority opinion overlooks this very material fact. It is of the very essence of the case, for upon it the verdict was rendered, and upon it depends the application of the modern doctrine of assumption of risk, which the majority opinion has not applied;

and it is because of this element of fact and this principle of law, that this case differs from Roberts v. Telephone Company, and Holmes v. Brandenbaugh, supra, and also from all other cases referred to in the majority opinion, and it is because of such facts that this case falls within the rules laid down by this court in Huhn v. Railroad, 92 Mo. 440; Soeder v. Railroad, 100 Mo. 673; O'Mellia v. Railroad, 115 Mo. 221; Francis v. Railroad, 127 Mo. 669; Bradley v. Railroad, 138 Mo. 302; Doyle v. Trust Co., 140 Mo. 1; Hamman v. Coal Co., 156 Mo. 232; Pauck v. St. Louis Dressed Beef Co., 159 Mo. 467; Grattis v. Railroad, 153 Mo. 380; Connolly v. St. Joseph Press Ptg. Co., 166 Mo. l. c. 463; Minnier v. Railroad, 167 Mo. l. c. 112; Holmes v. Brandenbaugh, 172 Mo. l. c. 66; Haviland v. Railroad, 172 Mo. l. c. 112; Curtis v. McNair, 173 Mo. l. c. 279; and Parks v. Railroad, 178 Mo. 108.

The very question in this case is, was it negligence on the part of the defendant to furnish to the plaintiff, as an appliance to reach the governor on the machine, a loose plank which was to rest upon the tops of the two steam chests, and which tops were not even or smooth, but had raised letters and nuts and bolts projecting an inch and an eighth in height, and if this was a negligent appliance, did the plaintiff assume the risk by remaining in the defendant's service and by using the appliance?

The question of whether or not the appliance furnished, to-wit, the plank used in combination with the tops of the steam chests, was or was not negligence, was one of fact, about which reasonably fair-minded men might differ, and it was therefore a question for the jury. [Francis v. Railroad, 127 Mo. 669; Pauck v. Beef Co., 166 Mo. 639.] The trial court left this to the jury and I think properly did so.

The question of whether or not the plaintiff assumed the risk of using the appliance is a mixed question of law and of fact. If the appliance was so patently

dangerous that no reasonably prudent man would use it, the plaintiff is not entitled to recover because he did use it, and the defendant takes this position, for it says, "He was a grown man, a skilled and experienced mechanic, and must have known, what a child would have understood, that a board resting unfastened upon any surface may slip or change its position." In other words, the defendant's argument is that the appliance was so patently dangerous that no reasonably prudent person would have used it, and, therefore, the plaintiff assumed the risk by using it.

But the majority opinion is quite the antithesis of the defendant's contention. It is that the appliance was safe and not dangerous at all, and that the plaintiff voluntarily used it, without protest.

Whether the appliance was safe or dangerous, was a question of fact for the jury, and they found it to be dangerous. Whether notwithstanding the dangerous condition the plaintiff was cut off from a recovery, depended upon whether it was so manifestly and obviously dangerous that a man of ordinary prudence would have refused to use it, or whether the danger of using it was not glaring and threatening and whether the plaintiff had a right to reasonably believe that he could safely use it by the exercise of ordinary care. If the former was the fact the plaintiff is not entitled to recover, but if the latter is true he is entitled to recover. In either case the question was one of fact for the jury, under proper directions as to the law by the court. And the trial court properly instructed the jury upon this feature of the case as follows:

"The court instructs the jury that even though you may believe and find from the evidence that the place where plaintiff was working at the time of the injury was unsafe and defective as defined by the other instructions, and that Mathis had knowledge of such condition, yet such knowledge would not defeat him in this action unless you further believe and find from the evi-

.dence that the danger therefrom was so glaring and threatening that a person in the exercise of ordinary care would not have used the same, or that the condition was such as to threaten immediate injury by its use.''

This is the law as laid down in the excerpt from Holmes v. Brandenbaugh, copied in the majority opinion, and in the other cases herein set out, and is the modern rule as to the assumption of risks. The majority opinion entirely ignores this rule, and for that reason I am unable to concur in it.

This case is unlike Fugler v. Bothe, 117 Mo. 475; Holloran v. Foundry Co., 133 Mo. 470; and Steinhauser v. Spraul, 127 Mo. 541.

In the case of Fugler v. Bothe, the plank composing the scaffold from which the plaintiff fell was nailed down, and did not slip, and could not slip. Exactly the reverse is the fact here.

In Holloran v. Foundry Co., the question was not that the plank was loose and slipped, but it was whether the master had furnished enough planks. The planks were not nailed down, but they were just as securely held down by the derrick which was being moved over them. And, in addition, the accident was not caused by the planks slipping, but by the plaintiff having to step off of the plank and put his foot against the iron girder, so as to use the crowbar to straighten the course of the derrick and keep it from running off of the planks, which makes that case a very different one from the case at bar.

In Steinhauser v. Spraul, the ladder was a proper appliance, but the accident was caused by the improper use of the proper appliance by the servant. Here, there was only one way for a servant to use the appliance, and the very question in the case is whether a plank that is safe in itself becomes dangerous when used in combination with the tops of the steam chests, with the projections described on the top of them, without any pro-

vision being made to prevent the plank from slipping from such a foundation.

These three cases were unquestionably decided properly under the facts in judgment, and the principles of law they announce have my concurrence. But those cases are not applicable to or decisive of the case at bar. The majority opinion says that the testimony is "silent as to the cause of the tipping of the plank; whether it was occasioned from the uneven surface upon the steam chests, or from insufficient width of the plank or from the movement of the plaintiff upon it, it is apparent that the accident was not caused by reason of any unsoundness of the plank," etc.

I agree that the accident did not occur from any unsoundness of the plank. But that does not determine the case. The case rests upon the unsafe appliance furnished, to-wit, the combination of the loose plank and the uneven surface of the tops of the steam chests.

I do not think such an appliance is so glaringly or threateningly dangerous that a person of ordinary prudence would refuse to use it, and, therefore, I do not think that the plaintiff is cut off from a right to recover because he did use it. I think the case turned upon the question whether the plaintiff had a reasonable cause to believe that notwithstanding the appliance furnished was dangerous, still he could use it by the exercise of ordinary care. And it was for the jury to say whether he did exercise such care, or whether the plaintiff caused it to tip from the manner in which he moved upon it.

The majority opinion says the surface of the steam chests was "solid and firm," and that notwithstanding the "emphatic" language of the defendant's chief engineer to the plaintiff to use the appliance, it is apparent "that its use was voluntary." I cannot agree to that statement of the facts. The plaintiff had never used it until so emphatically ordered to do so. Prior to that time he had stood with one foot on the top of each steam

Mathis v. Stock Yards Company.

chest. He was cursed by the chief engineer for so doing and ordered to use the plank on top of the steam chest. This certainly was not a voluntary use.

I, therefore, think the trial court properly submitted the case to the jury upon the question of negligence; that the instructions given fully and clearly defined the law to the jury, and hence the verdict is conclusive in this court.

As the majority opinion disposes of the case without deciding the question of the release further than to approve the case of Mateer v. Railroad, 105 Mo. 320, I deem it necessary only to say that I think Mateer v. Railroad was properly decided, but that the facts in judgment there are quite different from the facts in judgment here. In the Mateer case the release was sought to be avoided upon the ground that it had been procured by fraud, and the plaintiff broke down entirely in his attempt to show fraud. In that case the plaintiff received exactly the amount of damages he demanded for his injuries and signed a receipt therefor without reading the whole of it. There was no question about the payment being for anything else than the damages. Here the whole question was whether the amount the plaintiff received was for his wages for September or was for the damage he had sustained. The amount he received was concededly the exact amount of wages he was receiving while at work. The Mateer case is, therefore, wholly unlike the case at bar.

The foregoing is enough to explain to the legal mind the reasons for my dissent in this case. I doubt whether any good upon the whole can come from dissenting opinions. They take up the time of the dissenting judge which might profitably be spent upon other cases, and they are not pleasant to write. The only thing that ever prompts me to do so, is that I believe I am right and hence want the lawyers and the world to know "the reason for the faith that is in me," and to avoid

Vol 185 mo—30

being in the attitude of a "voiceless" dissent—meaning I suppose, a capricious dissent, not founded upon any reason. *Brace* and *Valliant, JJ.,* concur herein.