## HARRY C. MORGAN, Administrator, Appellant, v. ORONOGO CIRCLE MINING COMPANY, Respondent.

### Springfield Court of Appeals, December 4, 1911.

1. **MASTER AND SERVANT: Negligence: Jury Question: Mines and Mining.** In an action for damages on acount of the death of an employee of defendant, who was thrown from the top of the cage in which he was being lowered through a shaft in a mine, the evidence is examined and *held* that the question of whether the defendant was guilty of negligence or had discharged its legal duty towards the deceased employee, and used reasonable means to obviate the dangers which it knew, or should have known, surrounded the deceased, was for the jury.

2. ———: ———: **Assumption of Risk: Duty of Servant.** It is the duty of the servant to exercise ordinary care to learn the dangers which are likely to beset him in the service. He must not go blindly or heedlessly to the work when there is danger. He assumes the risk of injury from ordinary dangers of the employment and from such dangers as are known to him or discoverable by the exercise of ordinary care on his part, but he does not assume the risk of accident and injury which are due to the master's failure to exercise reasonable care.

3. ———: ———: **Duty of Master: Ordinary Care.** Although the master is required to use only ordinary care in furnishing the servant a reasonably safe place in which to work, yet,

what constitutes ordinary care is a question to be determined by the circumstances of each particular case.

4. **NEGLIGENCE: Definition: Words and Phrases.** The following definition of negligence by Judge Cooley is approved: "The failure to observe, for the protection of another person, that degree of precaution and vigilance which the circumstances justly demand, whereby such other person suffers injury."

5. ————: **Jury Question.** In an action for damages on account of negligence, if the evidence is susceptible of two inferences, one consistent with ordinary care and the other tending to show negligence, the question is one of fact for the jury.

6. ————: **Question for Court.** Before a court can take a case from the jury and consider the question of negligence as a question of law, the facts must not only be undisputed and the credibility of the witnesses not drawn in question, but no material fact must be left in doubt and the facts when most favorably considered for the plaintiff must be fairly susceptible to but one inference.

7. **MASTER AND SERVANT: Contributory Negligence: Servant's Knowledge of Danger.** Mere knowledge on the part of a servant that there is danger in working with the appliances furnished by his employer will not bar a recovery against the master for negligence, unless the peril is so obviously or glaringly dangerous as to threaten immediate injury, or unless it was unreasonable for him to suppose that he could safely use them and by the exercise of reasonable care safely work in the place provided by the master.

8. **DAMAGES: Death by Wrongful Act: Suit by Administrator: Nominal Damages, When.** In an action for damages against the master for negligently causing the death of a servant, where it appears from the evidence that the deceased left no wife or children surviving him, but the plaintiff, an adult brother, brought the suit as administrator of deceased's estate, in the absence of evidence showing the probable amount deceased would have accumulated during his expectancy in life, the plaintiff was at least entitled to nominal damages.

Appeal from Jasper Circuit Court.—*Hon. David E. Blair,* Judge.

REVERSED AND REMANDED.

*George R. Clay* and *R. H. Davis* for appellant.

(1) The demurrer to the testimony was improperly sustained and the nonsuit should have been set aside and a new trial granted because the evidence showed that defendant was negligent in having made no effort to take the "twist" out of the cable, and the testimony shows that the cage was not equipped with guides or rails to guide it through the shaft and defendant was negligent in not so equipping the cage. Guffey v. Railroad, 53 Mo. App. 469; Erwin v. Railroad, 94 Mo. App. 297; Seals v. Whitney, 130 Mo. App. 419; 26 Cyc. 1107; Smith v. Fordyce, 190 Mo. 25; Jones v. Railroad, 178 Mo. 548; 1 Labatt on Master and Servant, sec. 40; Bean v. Navigation Co., 24 Fed. 124; Nyback v. Lumber Co., 109 Fed. 738; Mining Co. v. Fullerton, 69 Fed. 23. (2) The plaintiff did not assume the risk arising from defendant's negligence. If plaintiff was furnished unsafe implements and appliances, a question of contributory negligence arises, but not assumption of risk. Cole v. Transit Co., 183 Mo. 94; Strickland v. Woolworth, 127 S. W. 628. (3) It was the duty of the court to submit to the jury the question of deceased's contributory negligence, if any; unless the danger and peril was so obvious that deceased must have known that the danger threatened immediate injury, and that he could not continue to work without injury. Dakan v. Chas, 197 Mo. 238; Curtis v. McNair, 173 Mo. 270. (4) The duty of the master to furnish his servant with reasonably safe tools and appliances is a personal duty and cannot be delegated, so as to escape liability. Combs v. Construction Co., 205 Mo. 367; Rodney v. Railroad, 127 Mo. 676. (5) The only risk which a servant assumes is the ordinary risk, such as happen on account of the nature of the business after the master has used reasonable care to avoid such result, but never assumes the risk of his master's negligence. McNair v. Curtis,

173 Mo. 280; Wendler v. Furnishing Co., 165 Mo. 537; Phippin v. Railroad, 196 Mo. 346; Charlton v. Railroad,. 200 Mo. 433; Koener v. Car Co., 209 Mo. 157; Cole v. Transit Co., 183 Mo. 81; George v. Railroad, 225 Mo. - 405; Garaci v. Construction Co., 124 Mo. App. 717; Jewell v. Bolt & Nut Co., 231 Mo. 194.

*Ray Bond, A. E. Spencer* and *A. L. Berger* for respondent.

(1) There was no evidence introduced in this case tending to prove actionable negligence on the part of defendant. Erwin v. Railroad, 94 Mo. App. 297, 68 S. W. 88; Scott v. Whitney, 130 Mo. App. 419, 110 S. W. 35; Cole v. Transit Co., 183 Mo. 94, 81 S. W. 1138; Curtis v. McNair, 173 Mo. 270, 73 S. W. 167; Smith v. Fordyce, 190 Mo. 25, 88 S. W. 679; Jones v. Railroad, 178 Mo. 548, 77 S. W. 896; 2 Thompson on Negligence, 983; Blanton v. Dold, 109 Mo. 64, 18 S. W. 1149; Winkler v. Basket Co., 137 Mo. 396, 38 S. W. 921; Holloran v. Foundry Co., 133 Mo. 47, 35 S. W. 260; Bennett v. Lime Co., 124 S. W. 612; Coin v. Lounge Co., 222 Mo. 488, 121 S. W. 1. (2) The burden is upon plaintiff to prove negligence as alleged in the petition and in this case it is apparent that plaintiff failed to support that burden of proof. Hodges v. Railroad, 135 Mo. App. 683, 116 S. W. 1131; Gordon v. Railroad, 222 Mo. 516, 121 S. W. 80; Newlin v. Railroad, 222 Mo. 275, 121 S. W. 125. (3) Plaintiff must also show that the defendant's negligence was the proxiate cause of the injury, and there was a total failure of proof in this respect. Werner v. Railroad, 138 Mo. App. 1, 119 S. W. 1076; Anderson v. Coal Co., 138 Mo. App. 76, 119 S. W. 986; Hodges v. Railroad, 135 Mo. App. 683; Wilkerson v. Railroad, 124 S. W. 543; Trigg v. Land Co., 187 Mo. 227, 86 S. W. 222; Schmidt v. Transit Co., 120 S. W. 96. (4) The facts of this case leave no room for dispute or contrary opinions in reasonable minds as to

the negligence alleged. It was a question therefore for the court and was properly decided by the court below. Hodges v. Railroad, 135 Mo. App. 683; Lawrence v. Ice Co., 119 Mo. App. 325, 93 S. W. 899; Henry v. Railroad, 76 Mo. 288, 43 Am. Rep. 762; Warner v. Railroad, 178 Mo. 125, 77 S. W. 69. (5) Under plaintiff's theory in this case as developed at the trial, and in his brief it must be held that deceased was guilty of contributory negligence. Cole v. Transit Co., 183 Mo. 94, 81 S. W. 1138; Dakan v. Chase, 197 Mo. 238, 94 S. W. 944; Curtis v. McNair, 173 Mo. 270, 73 S. W. 167; Wendler v. Peoples H. F. Co., 165 Mo. 527, 65 S. W. 737; Pauck v. Beef Co, 159 Mo. 467, 61 S. W. 806; Huhn v. Railroad, 92 Mo. 447, 4 S. W. 937; Soeder v. Railroad, 100 Mo. 681, 13 S. W. 714. (6) Under the evidence in this case, the deceased assumes the risk incident to the performance of the duties imposed upon him by reason of his employment. Roberts v. Telephone Co., 166 Mo. 378, 66 S. W. 158; Thomas v. Railroad, 109 Mo. 199, 18 S. W. 980; Price v. Railroad, 77 Mo. 508; Steinhauser v. Spraul, 127 Mo. 562, 28 S. W. 620, 30 S. W. 102; Nugent v. Milling Co., 131 Mo. 245, 33 S. W. 428; Mathis v. Stock Yards Co., 185 Mo. 434, 84 S. W. 66; Coin v. Lounge Co., 222 Mo. 488, 121 S. W. 1; Pulley v. Oil Co., 136 Mo. App. 172, 116 S. W. 430. (7) By contracting for the performance of his duties the servant agrees to relieve the master from all dangers proximately resulting from such risks as are naturally incident to the employment, and from all injuries proximately resulting from such extraordinary or unusual risks, or risks arising from the master's negligence, as are actually or constructively known to one of ordinary understanding. Morgan v. Railroad, 136 Mo. App. 337, 117 S. W. 106; Rowden v. Mining Co., 136 Mo. App. 376, 117 S. W. 695; Reichart v. Packing Co., 136 Mo. App. 565, 118 S. W. 525; Werner v. Railroad, 138 Mo. App. 1, 119 S. W. 1036; Harris v. Railroad, 124 S. W. (Mo.) 576; Doss v. Rail-

road, 135 Mo. App. 643, 116 S. W. 458; Courter v. Merc. Co., 136 Mo. App. 517, 118 S. W. 505; Butz v. Const. Co., 137 Mo. App. 222, 117 S. W. 685; Welsh v. Dieter, 136 App. 260, 117 S. W. 97.    (8)  Even where the servant acts in the presence of the master, or under his orders, or relying upon the master's superior knowledge, or with the assurance of safety, or under promise of repair if the danger be so obvious that a man of ordinary caution and prudence would not incur it, the servant cannot recover.  Burkhard v. Leschen, 217 Mo. 466, 117 S. W. 35; Pulley v. Oil Co., 136 Mo. App. 172, 116 S. W. 430; Buckner v. Stock Yards Co., 221 Mo. 700, 120 S. W. 766; Holloran v. Foundry, 133 Mo. 470, 35 S. W. 260; Lightner v. Grieb, 104 Mo. App. 173, 77 S. W. 764; Meyers v. Glass Co., 129 Mo. App. 556, 107 S. W. 1041; Blundell v. Mfg. Co., 189 Mo. 552, 88 S. W. 103; Stegman v. Gerber, 123 S. W. 1041. (9)  There was no proof whatever of the measure of damages, the loss to the estate of deceased by his death, measured in money.  Railroad v. Foreman, 174 Fed. 377; Swift v. Johnson, 138 Fed. 867; Railroad v. Townsend, 41 Ark. 382; Fordyce v. McCouts, 51 Ark. 509, 11 S. W. 694; Railroad v. Garner, 76 Ark. 555, 89 S. W. 550; Railroad v. Brown, 26 Kas. 443.

NIXON, P. J.—This was an action to recover damages for the death of Joseph C. Morgan who lost his life in the mine of the defendant on the 27th day of October, 1909.  The petition on which recovery was sought is as follows:  (Formal parts omitted.)

"Plaintiff for cause of action states that he is the duly appointed, qualified and acting administrator of the estate of Joseph C. Morgan, deceased, having been appointed by the probate court of Jasper county, Missouri.

"Plaintiff further states that defendant is and was at all the times herein mentioned, a corporation, organized and existing under the laws of the State of Mis-

souri, and was, on the 27th day of October, and has been for months prior thereto engaged in operating a mine near Oronogo, Missouri, known as Oronogo Circle Mine No. 5, which mine consists of a shaft, drifts, and the machinery and appliances used in connection therewith.

"Plaintiff further states that it was the duty of defendant to furnish its employees with a reasonably safe place in which to work, with reasonably safe tools and appliances, and reasonably safe machinery and appliances with which to lower its employees into said mine.

"Plaintiff further states that defendant used in its mine work animals which were lowered into its said mine through a shaft of said mine by means of an open-top cage, made of about 3x6 timbers and which was about 6x3x6 feet, and attached to a wire cable attached to hoisting machinery, which cable was what is known as a dead cable, that is, non-twisting cable; that on the day preceding the accident herein complained of, defendant carelessly and negligently replaced said cable with what is known as a live cable, that is, a twisting cable, which would cause said cage, and which did, while being lowered into the mine, to whirl and to strike the walls and sides of the shaft of said mine and to strike a column pipe in said shaft, running from the top to the bottom of the shaft.

"Plaintiff further states that defendant carelessly and negligently failed to take the twist out of said cable, as it was its duty so to do, before attempting to use said cable in lowering said cage and said work animals, and deceased into said mine.

"Plaintiff further states that defendant carelessly and negligently failed and omitted to equip and provide guides or rails or other appliances to hold said cage in position and to prevent it from tilting, whirling and striking the walls and sides of said shaft and

the column pipe in said shaft while descending into said mine.

"Plaintiff further states that the deceased, Joseph C. Morgan, was, on the 27h day of October, 1909, in the employ of defendant at its said mine; that it was a part of the duties of deceased to stand on the top of said cage, while its work animals were being lowered into said mine, and to aid and assist in the lowering of said cage and animals into said mine.

"Plaintiff further states that, on the 27th day of October, deceased, while in the employ of defendant, was assisting and aiding in the lowering of said cage and one of defendant's work animals into said mine, and while standing on the top of said cage, as he was required to do, without any fault, carelessness or negligence on his part, said cage, by reason of the 'twist' contained in the cable attached to said cage, was caused to whirl and tilt and to strike the sides of the walls of said shaft and to strike the column pipe in said shaft, which tilting and whirling of said cage and the striking of said cage against the sides and walls of said shaft and said column pipe threw deceased from said cage to the bottom of said shaft, a distance of 160 feet, killing him instantly.

"Plaintiff further states that if defendant had, before attempting to lower the deceased into its said mine by means of said cage and cable, taken the twist out of said cable, or, if defendant had equipped and provided guides, rails or other proper appliances to guide and hold said cage in position, said cage would not have struck the side and walls of said shaft and the column pipe in said shaft and said accident would not have occurred.

"Plaintiff further states that the death of deceased was caused and brought about by reason of the carelessness and negligence of defendant in furnishing and supplying said cage with said cable without first having the 'twist' taken out, and further by rea-

son of the carelessness and negligence of the defendant in failing to furnish and provide proper and sufficient guides or rails or other appliances to hold said cage in position and to prevent it from tilting and whirling and striking the sides and walls of said shaft and of the column pipe in said shaft while being lowered into the mine.

"Plaintiff further states that defendant had knowledge, or could have had knowledge by the exercise of ordinary care and prudence, of the dangerous condition of its machinery and appliances aforesaid, and of the danger to which deceased was exposed in being lowered into said mine with said machinery and appliances.

"Pliantiff further states that deceased left surviving him no wife, child or children, natural born or adopted; that at the time of his death he was twenty-one years of age.

"Plaintiff further states that, by reason of the premises, the estate of Joseph C. Morgan, deceased, has suffered damages in the sum of seventy-five hundred dollars, for which judgment is prayed."

Defendant pleaded, first, a general denial; second, contributory negligence of deceased in that it was the duty of deceased to stand on top of the cage to aid and assist in lowering the cage and animals into the mine, and to prevent the cage from bumping, and that although deceased knew that a new cable had been put on the night before which would cause more bumping than the old one, he negligently and carelessly failed to prevent, but permitted, the bumping, and that he was familiar with the work and the danger and the liability of the cage to bump, and that his own lack of attention to his duties and careless conduct permitted the bumping; and third, that deceased's injuries were the result of the ordinary risks of the employment.

The reply was a general denial.

The case was decided in the court below upon a demurrer to plaintiff's evidence. Defendant introduced no evidence. The court instructed the jury to find for the defendant, which, together with the overruling of plaintiff's motion for a new trial are the errors assigned.

Deceased had been in defendant's employ about two months. The evidence tended to show that at the time of his fatal accident and for some time prior thereto his duties had been to ride on top of a cage by which work animals were lowered through a shaft into the mine, and to guide said cage with his hand whilst it was being lowered and prevent it from bumping. The shaft was about 230 feet, and was laced or cribbed down about 130 feet. The cage was something like six feet high, three feet wide, and six feet long, and was constructed of 2x6 inch timbers. There were iron straps coming up from each corner of the cage, with ears, and there was a ring in the center they all went in, and this ring hooked onto the cable. Deceased stood on top of this cage on a 2x6 inch plank, turned edgewise. The shaft was 5x6½ feet within the cribbing, but was larger below the cribbing, so much so that a man standing on top of the cage as it was descending into the mine could not reach out and touch the walls of the shaft with his hand—as one witness expressed it, "the shaft was laced up so it was just one size down to about 130 feet, and after that it was like letting a can or tub down in the center of this room; there was nothing there to touch it on; after you got below the cribbing or lacing you could touch nothing,— only there were two pump columns and I think a steam line on the north side of the shaft which you could touch part of the way down this shaft. These column pipes extended from the top of the ground down to within fourteen or fifteen feet of the bottom of the shaft. There were no guides or rails to guide the cage in the shaft after it passed below the lacing or crib-

bing.'' The evidence showed that it was a part of
the duties of the deceased to look after the mule—to
take it down in the morning and bring it up at night,
and that it was a part of his duties to ride on the top
of the cage, the object being to properly guide the
cage while going down and keep it from whirling and
bumping on the sides or walls of the shaft, and the
same duty devolved upon deceased in bringing it up
to keep it from bumping on the sides or walls of the
shaft so the mule would not get hurt, and this had been
a daily occurrence for some two months.. A new cable
had been put on the cage during the afternoon of the
day previous to the accident, between 2:30 and 4
o'clock. It was used that afternoon and the next morn-
ing before deceased rode on the cage, but deceased
had not ridden on the cage on that afternoon after
the new cable had been attached. On the next morn-
ing, being the day on which the fatal accident hap-
pened, Duncan, the hoisterman, and Basil Surface,
the man who rode with deceased on the cage, and de-
ceased, had a conversation about the new cable and
its tendency to twist more than the old one. This
occurred just before the cage was lowered into the
shaft. Deceased understood that the new cable had
been attached, and that there was more reason to ex-
pect bumping and whirling with the new cable than
with the old. He himself asked the hoisterman to low-
er them more slowly, and he himself warned his com-
panion, Surface, of the necessity of greater care and
the danger of the cage bumping and whirling on ac-
count of said cable. Deceased at this time said to Sur-
face: ''We ought to kinda watch this cage now; got
this new cable on, and it is liable to go whirling; it is
liable to bump and we have got to be pretty careful.'
He said to the hoisterman: ''Lower us a little slower
because you have got a new cable on.'' And witness
Surface and deceased conversed together about being
more careful below the lacing on account of the whirl-

ing of the cage. Witness Surface was upon the cage when deceased fell off. He testified that "the cage bumped on the side where deceased was as soon as it got below the lacing, and began going around, and that it struck every time it went around and kinda gave it a bump, and that deceased fell off backwards, and it went to whirling then." It was a "live" cable and the "twist" was going out of it; it couldn't go down straight and the "twist" made the cage strike the pipe. It further appears from some of the evidence that all cables twist somewhat, but that the twisting diminishes by use; that a new cable had more tendency to twist than an old one, of which deceased had knowledge, and the duty of his employment which he undertook on the morning of his fatal accident was to guide the cage and prevent the twisting and bumping. The shaft was not equipped with guiders or rails to hold the cage in position in its passage through the shaft. There was plenty of room in the shaft for a cage of that kind to go down straight, if it did not turn around.

W. H. Frickleton who stated that he had been in the business of supplying machinery and wire cables for ten years, testified concerning the cable, in part, as follows: "Q. Explain just how this crucible steel cable or rotating cable, as it is sometimes called, is made? A. Well, the wires are twisted and make a five-eighths crucible steel cable; it is composed of six strands with nineteen wires to each strand, and it is all twisted one way, and the non-rotating cable is made two cables one over the other, one is twisted this way (indicating) and the other is twisted this way (indicating) so that in hoisting they are bound to each pull against the other; prevents it from twisting around. In other words they call it a non-rotating cable." John Rutherford, the ground foreman, testified that the old cable (the one taken off the day preceding the accident) was a dead cable and that "it wouldn't twist." Q. "What effect would a dead cable have on the cage

when being lowered into the ground? A. There would be no twisting in it and it wouldn't whirl." The evidence shows that the "twist" could have been taken out of the new cable by hitching a horse to it and dragging it around over the ground, and by letting it hang in the shaft over night with a heavy weight attached to it, and by pulling heavy loads with it. This was sometimes done, but the "twist" was not taken out of this cable.

Basil Surface, who was on the cage with deceased at the time of the accident, testified, in part, as follows: "I don't know exactly how deep the shaft is, but it is cribbed and laced about half way down . . . I saw Morgan when I got down to the bottom; he was dead. I think there were five pipes in this shaft; they were in the north part mostly. Q. After you got below the lacing, could you reach out with your hand and touch the wall of the shaft? A. Yes, sir. Q. How far did you have to reach? A. Some places were a little bigger than others; some places couldn't hardly reach it. . . . Q. What side was Morgan on? A. On the north side and facing south. Q. You say these column pipes were where? A. In the north end. I think the one the cage bumped on was nearly right in the northwest corner. These pipes were from two-inch up to eight-inch. Q. Where was the big eight-inch pipe? A. In the northwest corner. . . . Q. How long had you been around the mouth of this mine that morning before you and Morgan started down? A. Twenty-five minutes, I guess. Q. Anyone else around there? A. The rest of the miners were all there. Q. Had some of them gone down in the can prior to the time you started down? A. Yes, sir. Q. How many had gone down in the can? A. All down, I think, but two." Cross-examination: "I was Morgan's assistant, and it was my duty to ride with Morgan on top of the cage and to take the mule down and bring it out, and this was a daily occurrence. Both of

us would stand on the cage sometimes, and sometimes would sit down. Q. The very object and purpose of you and Morgan riding on that cage was to guide it when going down and to keep it from bumping? A. Yes, sir. Q. That is, to keep it from bumping on the sides of the shaft? A. Yes, sir. Q. That is what you and Morgan were looking for and trying to avoid when you rode down on the cage, wasn't it? A. That was our duty. Q. Now, below the lacing, the shaft was a foot bigger on all sides, wasn't it? A. Yes, I guess it was. Q. And the column pipes were on the side or corner that Morgan was riding on? A. Yes, sir. Q. And when the tub whirled and bumped it was on the corner that Morgan was on? A. Yes, sir. Q. And his corner of the cage only bumped once when it threw him off? A. Yes, sir. Q. It threw him off the first time it bumped? A. Yes, sir.'' He also testified in his direct examination as follows: ''Q. After the cage got below the lacing explain what it did, in your own way? A. The cage was almost as big as the shaft and while it was in this lacing it couldn't turn, and after it got down below, there was room enough between the wall and cage to let it give and it went to whirling. Q. How rapidly did it whirl? A. Pretty fast. Q. Give the jury some idea how fast it whirled? A. I do not know exactly. Q. After it commenced to whirl, state if the cage struck anything? A. Yes, sir. Q. What did it strike? A. I think it struck a column pipe. Q. When it struck the column pipe, what became of Morgan? A. He fell off. Q. Where did he fall to? A. Bottom of the shaft.'' On re-direct examination he testified, in part, as follows: ''Q. Do you know what made it bump? A. No, it just hit this pipe. Q. Do you know what made it hit the pipe? A. No, the cable caused it. Q. How? A. It was a live cable and the twist was going out of it and it couldn't go down straight. The Court: Which bumping do you mean the cable caused, the first or last? Witness:

It caused all of them.'' Further, on cross-examination: ''Q. Then coming back again, Mr. Surface, the object of you and Morgan riding on the cage was to keep to cage from bumping and you were there looking to see if it did bump to prevent it bumping; that is right, isn't it? A. Yes, sir. Q. And no matter what kind of a cable you had on there, that was what you were looking for? A. Yes, sir. Q. That it what you had looked for before, and that was what you were looking for that day? A. Yes, sir. Q. You and Morgan talked about this cage being liable to bump before you descended that day? A. We did. He said, 'We ought to kinda watch this cage now; got this new cable on, and it is liable to go whirling.' Q. Before the hoisterman started to let you down, Morgan said to you, 'There is a new cable on here; it is liable to bump and we have got to be pretty careful,' or words to that effect? A. Yes, sir. Q. Right at that time had the hoisterman called to you about the new cable before you went down? A. Yes, sir. Q. Do you remember Morgan saying to the hoisterman, 'Lower us a little slower because you have got a new cable on?' A. Yes, sir. Q. And he did lower you to some extent a little slower? A. Yes, sir, a little. Q. Then, if I understand you rightly, Morgan said to you that there was danger of it bumping on account of this new cable? A. Yes, sir. Q. And be more apt to bump below the lacing, that was what you were looking for, wasn't it? A. Yes, sir. Q. And this is what you discussed before you were lowered; what Morgan discussed? A. We looked for it to go whirling after we got down there, yes. Q. And between you and Morgan you talked about being more careful below the lacing on that account? A. Yes, sir. Q. And Borgan was especially saying to you that you would have to be more careful as soon as you left the lacing? A. Just before we went down. Q. Do you know the exact words

that Morgan said to you before starting down? A. No, not exactly. Q. Well, you remember testifying in this trial before and in the coroner's inquest, don't you? A. Yes, sir. Q. Do you remember saying at that time that before you went down Morgan said to you, 'This new cable is liable to bump and cause us trouble, we will have to be careful,' is that what he said? A. Just about, yes, sir. Q. What did you say to Morgan when he told you this? Did you tell him you would watch your end of it? A. Yes, sir. Q. Did you watch your end of it? A. Yes, sir. Q. And you didn't bump? A. Not until his bumped first. Q. Who was it that called to the hoisterman to lower you slowly—didn't you say it was Morgan that called to the hoisterman to lower you slower because you had a new cable? A. Yes, sir." Re-direct examination: "Q. I understand you to say the hoisterman called down to you they had on a new cable and to be careful? A. Yes, sir. Q. What did Morgan say, if anything, in reply to that? A. He said, 'Better let us down a little slower.' Q. And said to you, you would have to be a little careful? A. Yes, sir. Q. That was when you were starting down? A. Just before we went to the shaft to get on the cage. Q. You had no difficulty in controlling it as long as you were inside the cribbing? A. Not so bad. Q. After you got below the lacing, you say it began to revolve? A. As soon as his end bumped it began whirling. Q. Were you holding onto anything? A. Holding to the cable. Q. Could you reach out and touch anything yourself? A. I could touch the lacing. Q. After you got below the lacing? A. Some places I could. Q. Do you know whether he was reaching out and touching anything at the time of the bump? A. He was guiding it the same as I was. Q. Could you see what he was holding to? A. He was holding to the cable and touching the wall with his other hand. Q. When did it commence to whirl with reference to the time it got below the lacing? A. As soon as it

got below the lacing it bumped and that threw my end over against the wall; and it began going around. . . . Q. The cage didn't bump, did it, until you got below the lacing or cribbing? A. No, sir. Q. And that was after it had been whirling? A. It bumped before it went to whirling. Q. Up in the lacing? A. No, below the lacing. Q. When did it commence to whirl? A. After it bumped. Q. That was after it got below the lacing, wasn't it? A. Yes, sir. Q. Do you know what made it bump? A. No, it just hit this pipe. Q. Do you know what made it hit this pipe? A. No, the cable caused it. Q. How? A. It was a live cable and the twist was going out of it, and it couldn't go down straight. . . ." Mr. Berger: "Q. And before you went down the thing that Morgan discussed with you was that you would have to be more careful after you got below the lacing, that is where the danger would be? A. He said before we went down to be more careful with this now on account of this new cable."

The plaintiff testified that he is a brother of deceased and administrator of deceased's estate; that deceased was twenty-one years of age, was a single man, and had no children, natural born or adopted.

There was also evidence tending to show that the change of cables was made as a precaution for the safety of the men, it having been reported to the superintendent that the old cable was becoming unsafe.

It thus appears from the evidence in this case that the deceased had been employed in the mine shaft of the defendant for some time prior to the fatal accident and that one of his duties had been to ride on top of the mule cage in which work animals were lowered into the mine; that he knew that the cable in use at the time of the accident was a new one and that there was the more reason to expect bumping and whirling from this cable than from the old one; that he himself asked the hoisterman to lower them a little slower on account of the new cable, and warned his

companion, Surface, of the necessity of greater care on account of the new cable causing the cage to bump and whirl as it descended into the shaft. It was also part of his duty, standing on the top of the cage, to prevent the cage from striking against the sides and causing the bumping. The injury causing his death actually happened by reason of the twisting of the cable, causing the cage to strike the sides of the shaft by which he was thrown from his position to the bottom of the shaft and received his fatal injuries.

In this case it appears that whatever defects and dangers there were from the use of the cage and from the twisting of the cable and other appliances that were used, were patent and obvious, and that the deceased was fully advised of the dangers of working under such defective conditions and with the appliances furnished.

In many jurisdictions it is held that the employee assumes the known or obvious dangers incident to the employment though such dangers arise from the master's negligence, but the courts of Missouri have taken a position which affords greater protection to the servant. It is the duty of the master to furnish to the servant a place and appliances reasonably safe under the circumstances of the employment to do the work required of the servant. On the other hand, it is the duty of the servant to exercise ordinary care to learn the dangers which are likely to beset him in the service. He must not go blindly or heedlessly to the work when there is danger. He assumes the risk of injury from the ordinary dangers of the employment and from such dangers as are known to him or discoverable by the exercise of ordinary care on his part. [Roberts v. Telephone Co., 166 Mo. l. c. 378, 379, 66 S. W. 155; Thomas v. Railway Co., 109 Mo. l. c. 199, 18 S. W. 980; Price v. Railroad, 77 Mo. 508; Steinhauser v. Spraul, 127 Mo. l. c. 562, 28 S. W. 620, 30 S. W. 102; Nugent v. Kauffman Milling Co., 131 Mo. l. c. 245, 33 S. W.

428; Mathis v. Kansas City Stock Yards Co., 185 Mo. 434, 84 S. W. 66; Coin v. Lounge Co., 222 Mo. 488, 121 S. W. 1; Pulley v. Standard Oil Co., 136 Mo. App. 172, 116 S. W. 430.] In this State the servant does not assume the risks of accident and injury due to the master's failure to exercise reasonable care; and if the defendant negligently furnished deceased with an unsafe place in which to work, and unsafe appliances, the question of the assumption of risk does not arise. The risks which the servant assumes are those which are incident to his employment when the master has properly discharged his duties toward his servant, but not the risks arising from the master's negligence. Therefore, if the master's negligence caused the injury to the servant, the doctrine of assumed risk fails, having no basis on which to stand. [Strickland v. Woolworth & Co., 143 Mo. App. 528, 127 S. W. 628; George v. Railroad, 225 Mo. 364, 125 S. W. 196; Cole v. St. Louis T. Co., 183 Mo. l. c. 94, 81 S. W. 1138.]

The question therefore arises whether, under the evidence in this case, the demurrer should have been sustained as to the master's negligence in furnishing a twisting cable or in failing to furnish sufficient guides or rails to hold the cage in position to prevent it from striking the sides of the shaft or the column pipe.

The definitions of negligence are more numerous than appear under any other title in the scope of the law. The definition given by an eminent authority, Judge COOLEY, is: "The failure to observe for the protection of another person that degree of precaution and vigilance which the circumstances justly demand whereby such other person suffers injury."

The duty of the master is to exercise reasonable care, having regard to the hazards of the service, in furnishing his servant with reasonably safe place in which, and reasonably safe appliances with which, to work. This duty is a continuous and non-delagable one, and calls upon the master to use all reasonable

means to abate dangers which he knows exist or which
should have been known by an ordinarily prudent man
in his situation in the exercise of reasonable care. Only
ordinary care is required of the master; but what con-
stitutes ordinary care is a question to be determined
by the circumstances of each particular case, the stand-
ard being, such care as under the circumstances an
ordinarily prudent man would exercise, and requires
a person to take into consideration the natural and
probable consequences of the given act—not those that
are remote or speculative or merely possible—and the
rule of admeasurement is, the greater the hazard the
greater the care required.   [Woods v. Railroad, 188
Mo. 229, 86 S. W. 1082.]

   In considering a demurrer to evidence, care must
be taken not to infringe upon the constitutional right
of trial by jury; and, when the undisputed evidence
in the record is susceptible of two inferences, one con-
sistent with ordinary care, and the other tending to
show negligence, such evidence, leaving a ground
for   difference   between   fair-minded   men   as   to
whether or not negligence existed (that is, if the
evidence is susceptible of two inferences, one con-
sistent with ordinary care, and the other tending to
show negligence), the question is one of fact for the
jury.   This is the more apparent when it is consid-
ered that negligence is not a fact susceptible of direct
proof but is an inference deducible from the evidence,
and its existence may be in issue though the facts on
which it is based are not in dispute.   It is also ele-
mentary law in this State that a demurrer admits every
fact of the plaintiff's case to be true which the evi-
dence tends to prove, whether the evidence be direct
or indirect, as well as all reasonable deductions that
are to be drawn therefrom; and before a court can
take a case from the jury and consider the question of
negligence as a question of law, the facts must not
only be undisputed, and the credibility of witnesses

not drawn in dispute, but no material fact must be left in doubt, and the facts, when most favorably considered for the plaintiff, must be fairly susceptible of but one inference. [Evans v. Railroad, 178 Mo. 508, 77 S. W. 515; Eckhard v. St. Louis T. Co., 190 Mo. 593, 89 S. W. 602; Williamson v. St. Louis T. Co., 202 Mo. 345, 100 S. W. 1072; McKenzie v. United Rys. Co., 216 Mo. 1, 115 S. W. 13.] Negligence is not to be inferred alone from the fact that deceased fell off the cage and was killed. There was evidence in the record tending to show that this cage was open at the top; that it was constructed of 2x6 inch planks, and was some six feet high, three feet wide, and six feet long; that this cage was attached to the cable by straps coming up from each corner fastened to a ring in the center onto which the cable was hooked. The evidence further tends to show that no place was provided for the deceased and his companion to ride on the cage except on the top of it, standing on a board 2x6 inches turned edgewise; that the cage was hung to a rotating or twisting cable and lowered into the shaft by a hoisterman placed some thirty or forty feet above the mouth of the shaft. The shaft was some 230 feet deep, and was laced or cribbed down about 130 feet. Within the cribbing, the space in which the cage moved was about 5x6½ feet. Below the cribbing the space was somewhat larger so that it was difficult for the persons standing on top of the cage to touch the sides of the walls. It was the duty of the deceased to stand on top of the cage, with the live mule in it, on a 2x6 inch plank turned edgewise, and holding the cable with one hand, to keep the cage from bumping against the walls as it went up or down the shaft. When the cage got below the lacing it was difficult to keep it from swinging from side to side or prevent it from whirling when the cable twisted; so that the position of deceased when below the cribbing was not only rendered insecure by the bumping, but the whirling, first one way and then the other, on the

twisting cable was calculated to make him dizzy and thus less able to protect himself. On the morning of the accident, as we have said, a new "twisting" or "live" cable had been put in place, replacing the old one which was "dead." The "twist" had not been taken out of it as might readily have been done, and the evidence shows that such a cable would be more likely by reason of the "twist" to make the cage more difficult to manage and that it would be more likely to cause the cage to strike against the walls of the shaft than would a non-twisting cable. The cage could not revolve or whirl so long as it was within the cribbing owing to the size of the shaft, but when it passed out of the cribbing the shaft was so large that it could freely revolve when swung to a twisting cable and was likely to strike the column pipe in one corner of the shaft or the sides of the shaft. When deceased made his last descent on this cage, there was no trouble while the cage was within the cribbing, but the evidence tends to show that as soon as it passed below the cribbing the "twist" in the new cable commenced to run out, causing the cage to start to whirl, and it struck the column pipe, causing deceased to be thrown from the top of the cage where he was standing to the bottom of the shaft. Under the facts and circumstances surrounding the accident, whether the master was guilty of the negligence charged in the petition— and whether the same was the proximate cause of the death of the deceased—and whether the master discharged his legal duty and used reasonable means to obviate the dangers which it knew or should have known surrounded the deceased—we think were questions that should have been submitted to the jury.

If the jury should find that the master was guilty of negligence, the question would then arise at the trial as to the respondent's defense of contributory negligence. Mere knowledge on the part of deceased that there was danger in working with the appliances

or instrumentalities furnished by his employer would not defeat the present action unless the peril was so obviously or glaringly dangerous as to threaten immediate injury, or unless it was unreasonable for him to suppose that he could safely use them and by the exercise of reasonable care safely work in the place provided by his master in the performance of the work required of him. [Huhn v. Railway Co., 92 Mo. 440, 4 S. W. 937; Soeder v. Railway Co., 100 Mo. 673, 13 S. W. 714; Hamilton v. The Rich Hill Min. Co., 108 Mo. 364, 18 S. W. 977; Dakan v. Chase & Son Merc. Co., 197 Mo. 238, 94 S. W. 944; Weston v. Lackawana Min. Co., 105 Mo. App. 702, 78 S. W. 1044.] Under the evidence this question was one that should have been submitted to the jury.

The respondent contends that there was no proof whatever of substantial damages and that therefore the demurrer was properly sustained. The evidence on this question shows that the deceased left no wife, child or children, surviving him, but that the plaintiff was his brother, and that at the time of deceased's death he was unmarried and was over twenty-one years of age. After plaintiff had shown that deceased was killed by reason of the breach of the duty that defendant owed him, in the absence of evidence showing the probable amount deceased would have accumulated during his expectancy in life, the plaintiff was at least entitled to a judgment for nominal damages.

It follows from what has been said that the judgment herein must be reversed and the cause remanded for a new trial, and it is so ordered. All concur.